Docket No. 96057–Agenda 16–November 2003.

H&M COMMERCIAL DRIVER LEASING, INC., Appellee, v. FOX VALLEY CONTAINERS, INC., Appellant.

Opinion filed February 20, 2004.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, H&M Commercial Driver Leasing, Inc. (H&M), filed an action for breach of contract against defendant, Fox Valley Containers, Inc. (Fox Valley), in the circuit court of Cook County. The circuit court granted H&M judgment on the pleadings (735 ILCS 5/2–615(e) (West 2000)), and the appellate court affirmed (No. 1–01–2831 (unpublished order under Supreme Court Rule 23)). We granted Fox Valley leave to appeal (177 Ill. 2d R. 315(a)) and now affirm.

Background

H&M is an Illinois corporation in the business of leasing truck drivers and related personnel. On January 10, 2000, H&M and Fox Valley entered into an agreement in which H&M agreed to furnish Fox Valley licensed truck drivers, and Fox Valley agreed to pay H&M on a per-hour basis for the drivers. The parties’ agreement contains the following provision (hereinafter referred to as paragraph 13), which is the genesis of this lawsuit:

“[Fox Valley] agrees that it will not hire any of the drivers and other personnel that [H&M] furnishes to [Fox Valley] for a period one (1) year from the termination date of this Agreement. However, [Fox Valley] may hire any driver and other personnel whose employment with [H&M] terminated at least one year prior to being hired by [Fox Valley]. In the event that [Fox Valley] does hire any driver or other personnel [
sic
] will be in violation of the terms of this Agreement, then [Fox Valley] shall pay to [H&M] for each driver and other personnel hired in violation of this agreement $15,000 as liquidated damages, plus all costs and expenses, including attorney’s fees, incurred by [H&M] in enforcing the provisions of this Agreement, including injunctive relief. [H&M] and [Fox Valley] agree and acknowledge that the liquidated damages set forth in this paragraph are a reasonable estimate of the damages which would result from a breach of this paragraph, that actual damages from such a breach would be difficult to ascertain, and that the liquidated damages are an alternative to performance and not a penalty.”

The parties’ contract length was indefinite until cancelled by either party upon written notice.

During the course of the agreement, H&M leased to Fox Valley a truck driver named James Booker. On February 11, 2000, Fox Valley hired Booker as a truck driver. After learning of Booker’s hiring by Fox Valley, H&M filed a complaint for breach of contract in the circuit court. H&M alleged that by hiring Booker, Fox Valley breached paragraph 13 of the parties’ agreement, under which Fox Valley agreed not to hire any of the drivers provided by H&M under the contract for one year following the termination of the contract. H&M sought damages as provided in paragraph 13.

Fox Valley moved to dismiss the complaint pursuant to section 2–619 of the Code of Civil Procedure (735 ILCS 5/2–619 (West 2000)). In the motion, Fox Valley pointed out that Booker did not have a written employment agreement with H&M, Booker terminated his employment with H&M of his own accord, and Booker solicited Fox Valley for new employment. In an affidavit attached to H&M’s motion, Booker averred that his motivation for leaving H&M was the lack of regular work. Fox Valley maintained that H&M’s complaint failed to state a cause of action because paragraph 13 was unenforceable as a matter of law due to the fact that it adversely affected Booker’s right to free employment.

The circuit court denied Fox Valley’s motion. Fox Valley then requested certification of the question to the appellate court pursuant to Supreme Court Rule 308. The circuit court denied the request.

In its answer, Fox Valley admitted all relevant facts contained in H&M’s complaint. However, Fox Valley denied that it committed any breach of contract. Fox Valley contended that its hiring of Booker did not violate paragraph 13 of the agreement because the paragraph is “violative of public policy as it is a restraint of trade on a third party.”

H&M thereafter moved for judgment of the pleadings. The circuit court granted the motion and entered judgment for H&M in the amount of $18,747, inclusive of attorney fees and costs.

On appeal, Fox Valley argued that the circuit court erred in finding a breach of contract because the written agreement unreasonably restricted free trade and was thus unenforceable as a matter of public policy. Fox Valley noted that Booker had terminated his employment with H&M of his own accord and had solicited Fox Valley for employment. The appellate court rejected these arguments, holding that paragraph 13 does not violate public policy because it did not unduly place restraints on free trade. Rather, paragraph 13 merely placed restrictions on Fox Valley’s ability to hire drivers from H&M, restrictions to which Fox Valley had agreed.

Analysis

Fox Valley contends that paragraph 13 acts as a restrictive covenant on third parties without their consent and is thus unenforceable as a matter of public policy. As a result, Fox Valley argues that the circuit court’s entry of judgment on the pleadings, as affirmed by the appellate court, was in error.

Judgment on the pleadings is properly entered in instances where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. 
M.A.K. v. Rush-Presbyterian-St. Luke’s Medical Center
, 198 Ill. 2d 249, 255 (2001). Only those facts apparent from the face of the pleadings, matters subject to judicial notice, and judicial admissions in the record may be considered. Moreover all well-pleaded facts and all reasonable inferences from those facts are taken as true. 
M.A.K.
, 198 Ill. 2d at 255. On appeal, the reviewing court must determine whether any issues of material fact exist and, if not, whether the movant was, in fact, entitled to judgment as a matter of law. 
M.A.K.
, 198 Ill. 2d at 255. The standard of review is 
de novo
. 
M.A.K.
, 198 Ill. 2d at 255.

Traditionally, this court, in keeping with the principle of freedom of contract, has been reluctant to invoke its power to declare a private contract void as contrary to public policy. We have previously recognized that, in considering the question,

“it should be remembered that it is to the interests of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts. Agreements are not held to be void, as being contrary to public policy, unless they be clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless they be manifestly injurious to the public welfare.” 
Schumann-Heink v. Folsom
, 328 Ill. 321, 330 (1927).

Whether an agreement is contrary to public policy depends on the particular facts and circumstances of the case. 
O’Hara v. Ahlgren, Blumenfeld & Kempster
, 127 Ill. 2d 333, 341-42 (1989).

Fox Valley submits that this case is controlled by 
Szabo Food Service, Inc. v. County of Cook
, 160 Ill. App. 3d 845 (1987). There, the plaintiff, Szabo, a food management service, contracted with the defendant, Cook County, to provide it with food managers for the county jail. The contract contained a provision in which the county agreed that it would not hire any of Szabo’s employees for six months after the termination of the contract and would not permit former Szabo employees to be employed within the county. After the contract was terminated, the county entered into a contract with one of Szabo’s rivals, Canteen. Canteen had hired four workers who had previously worked for Szabo, and those four ultimately were assigned to the county jail food operations. Szabo filed suit against the county for breach of contract and sought an injunction to prevent Canteen from employing the four workers in question. The circuit court denied injunctive relief and found the provision to be unenforceable. 
Szabo
, 160 Ill. App. 3d at 846-47. The appellate court affirmed the decision, ruling that the clause was unenforceable because its effect was to restrict the right of Canteen, a corporation not a party to the agreement, to hire former managers of the plaintiff to work for its operations at the jail. 
Szabo
, 160 Ill. App. 3d at 848-49. The court held that the provision created “an unreasonable restriction on the freedom of contract of members of the public (
i.e.
, of persons who are not parties to the contract containing the covenant), and therefore the covenant is not enforceable.” 
Szabo
, 160 Ill. App. 3d at 849.

A careful review of 
Szabo
 reveals the case is not squarely on point with the case at bar. The contract provision there essentially placed restrictions on the hiring practices of a third company, Canteen, which was not a party to the agreement. In this case, Fox Valley is a party to the contract which contained the provision restricting its ability to hire former H&M employees.

We note that in distinguishing 
Szabo
 on similar grounds and in upholding the enforceability of paragraph 13, the appellate court in this case relied upon 
American Food Management, Inc. v. Henson
, 105 Ill. App. 3d 141 (1982). There, the plaintiff, American Food, was a corporation which provided food services to facilities such as college dormitories. American Food entered into a contract with the owner of Stevenson Hall in Carbondale, Illinois. The parties agreed that Stevenson would not hire American Food employees for a period of one year after the termination of the contract. Meanwhile, American Food employed Wesley Henson while he was a student in Missouri and ultimately offered him a permanent job. The new job required Henson to relocate to Kansas. Henson accepted American Food’s verbal offer and relocated. One week after his move, he received a written contract of employment from American Food. The written contract contained a clause which provided that Henson, upon termination of his job, would not work for any American Food competitor within a 25-mile radius of any dormitory unit at which he had worked for American Food. Henson signed the agreement. Eventually, Henson was transferred to Wilson Hall in Carbondale, Illinois. Henson later quit American Food’s employ and found work at Stevenson Hall. American Food sued both Henson and the owner of Stevenson Hall on theories of breach of contract. The circuit court ruled in favor of American Food against both Henson and the owner of Stevenson. 
American Food Management
, 105 Ill. App. 3d at 142-43.

The appellate court reversed the finding for American Food with respect to Henson. The court held that the 25-mile restrictive covenant between the two constituted a contract of adhesion because Henson was never told about the provision prior to his relocation to Kansas. 
American Food Management
, 105 Ill. App. 3d at 146-47. Relevant to our discussion here is the court’s treatment of a secondary issue, 
i.e.
, the validity of the contractual provision between American Food and the owner of Stevenson Hall. The appellate court first noted that the validity of the provision was never challenged in the circuit court and that, on appeal, the question was raised very vaguely. Nevertheless, the court stated that

“[e]ven if the point were not waived for review, having been raised for the first time in this court, the suggestion of ambiguity is not well taken. Wesley Henson being one of the ‘management employees of American Food [
sic
] Inc.’ at the time the contract expired, there is no doubt as to its application to him.” 
American Food Management
, 105 Ill. App. 3d at 147.

The court upheld the circuit court’s order enjoining Stevenson Hall from employing Henson for one year. 
American Food Management
, 105 Ill. App. 3d at 147-48.

As noted, the appellate court relied upon 
American Food Management
 in this case. We recognize that the pertinent facts in 
American Food Management
 are similar to those at issue here. However, we are troubled by the lack of any detailed analysis in 
American Food Management
 of the public policy questions these types of cases raise. Indeed, due to the defendant’s waiver of the issue, the court in 
American Food Management 
merely applied the provision without any discussion whatsoever of its validity. For that reason, we do not find the case particularly helpful in answering the public policy questions that are before us.
(footnote: 1)
 Although this issue has not been squarely addressed by Illinois courts, the matter has been examined by courts in other jurisdictions. For example, in 
Heyde Cos. v. Dove Healthcare
, 258 Wis. 2d 28, 654 N.W.2d 830 (2002), the Wisconsin Supreme Court held that an employee’s individual right and freedom to contract may not be restricted by a contract between two employers unless the employee is aware of and consents to such a restriction. The case centered on an agreement between Greenbriar Rehabilitation, which furnished physical therapists to nursing home facilities, and Dove Healthcare, a health-care provider that operated nursing homes. The agreement provided that Greenbriar was to place physical therapists at Dove’s Eau Claire facility. The agreement also contained a provision by which Dove agreed not to hire Greenbriar therapists as employees during the duration of the contract and for a period of one year thereafter. Dove eventually terminated the agreement and shortly afterward hired one current and three former Greenbriar employees. Greenbriar filed suit, seeking damages for the breach of contract. 
Heyde
, 258 Wis. 2d at 32, 654 N.W.2d at 832.

In assessing the enforceability of the provision, the court first applied a Wisconsin statute which concerned the enforcement of any unreasonable restrictive covenant to the provision at issue. The court found the statute to be applicable because the court construed the provision to be an indirect restrictive covenant. The court stated:

“[I]t is clear that the no-hire provision is harsh and oppressive to Greenbriar’s employees and is contrary to public policy. The former Greenbriar employees who were hired by Dove testified that they had no knowledge of the no-hire provision and that Greenbriar did not ask them to sign a non-compete agreement. One of the employees *** testified that she specifically asked Greenbriar whether she would be bound by a non-compete agreement and was told that she would not be subject to such restrictions. *** This court has *** recognized the necessity of consideration in referencing an employee’s decision to sign a covenant not to compete that he or she deems unreasonable.” 
Heyde
, 258 Wis. 2d at 40, 654 N.W.2d at 836.

The court further noted that Greenbriar could protect its interest in maintaining its employees by utilizing a valid restrictive covenant in compliance with Wisconsin laws. Wisconsin law required that employees know they are subject to a restrictive covenant and that they consent to such a provision. For this same reason, the court also found the provision to be unenforceable under the common law, notwithstanding the applicability of the Wisconsin statute concerning restrictive covenants. 
Heyde
, 258 Wis. 2d at 42-44, 654 N.W.2d at 837-38.

In contrast to 
Heyde
, the Virginia Supreme Court, in 
Therapy Services, Inc. v. Crystal City Nursing Center, Inc.
, 239 Va. 385, 389 S.E.2d 710 (1990), upheld the validity of a similar contractual provision. The facts in 
Crystal City
 are essentially the same as in the 
Heyde
 case, 
i.e.
, the provider of physical therapists seeking to prevent nursing home customers from hiring provider’s employees. 
Crystal City
, 239 Va. at 386-87, 389 S.E.2d at 711. The nursing home contended that the provision was unenforceable because it violated public policy in that it affected the rights of third parties without their consent or knowledge. 
Crystal City
, 289 Va. at 387, 389 S.E.2d at 711. The court began its analysis by noting that the provision at issue was neither a covenant not to compete nor a restrictive covenant between an employer and employee. Rather, the court ruled that the provision represents an agreement where “one party agrees to forego the ability to hire certain people who are not parties to the contract. As such, it is a contract in restraint of trade and will be held void as against public policy if it is unreasonable as between the parties or is injurious to the public.” 
Crystal City
, 239 Va. at 388, 389 S.E.2d at 711. The court determined that the restraint was reasonable because it afforded fair protection to the interests of the party favoring it and that it was not so broad as to interfere with the interests of the public. The court held that the provider had a legitimate interest in maintaining professional personnel in its employ–without such a clause the provider would become an “ ‘involuntary and unpaid employment agency.’ ” 
Crystal City
, 239 Va. at 388, 389 S.E.2d at 712. With respect to the interests of the public, the court addressed the employees’ lack of knowledge of the clause in depth:

“The right to earn a livelihood is embraced in the constitutional concept of ‘liberty.’ [Citation.] However, this right is conceptually and practically distinct from a claim of a right to specific employment. Neither [the nursing home] nor the trial court has cited any authority for the proposition that individuals have a right to employment by an employer of their choice or by any specific employers. The evidence indicated that in the Northern Virginia area, therapists were in low supply and in high demand and, thus, should they choose to leave Therapy Services’ employ, they could secure like positions in the area.

Similarly, there was no adverse impact on the interest of the public at large. The availability of therapists’ services was not diminshed since the affected therapists were not precluded from working in Northern Virginia or any other area. Under these circumstances, we cannot conclude that [the provision] deprived the affected therapists of the ‘right to seek a livelihood’ or that it interfered ‘with the interest of the public.’ [Citation.]” 
Crystal City
, 239 Va. at 389, 389 S.E.2d at 712.

As a result, the court upheld the validity of the provision.

After considering both opinions, we believe the Virginia Supreme Court provides the most guidance with respect to the case at bar. As an initial matter, we agree with that court that paragraph 13 is neither a covenant not to compete nor a restrictive covenant between employer and employee.
(footnote: 2) This is not a case where the employee is arguing that he or she has been foreclosed from employment. In our view, the provision at issue restricted one employer’s ability to hire former employees of the other employer. Thus, as the Virginia Supreme Court recognized, the contract provision acts as a restraint on trade. This court has held that “in determining whether a restraint [on trade] is reasonable it is necessary to consider whether enforcement will be injurious to the public or cause undue hardship to the promisor, and whether the restraint imposed is greater than is necessary to protect the promisee.” 
Bauer v. Sawyer
, 8 Ill. 2d 351, 355 (1956).

H&M argues that paragraph 13 is reasonable, as it protects its sole business asset, its drivers, from being hired away by its customers. If customers could hire H&M’s drivers on a permanent basis, then they would no longer need H&M’s services. We agree that this is a legitimate interest and that paragraph 13 affords fair protection to that interest. It is important to note that, under the provision, H&M employees are not restricted from seeking employment as drivers with any employer other than Fox Valley. Fox Valley is not restricted from hiring all H&M employees, just those who had been provided to Fox Valley from H&M. Moreover, Fox Valley is not, under the provision, completely barred from employing H&M’s former employees; rather, Fox Valley must pay H&M the liquidated damages to which it agreed, if it does so within one year of the termination of the contract. We do not believe this restriction is unreasonable. We agree with the Virginia Supreme Court that to conclude otherwise would render H&M nothing more than “ ‘an involuntary and unpaid employment agency.’ ” 
Crystal City
, 239 Va. at 388, 389 S.E.2d at 712. Paragraph 13 prevents clients like Fox Valley from appropriating the value H&M created in the placement of valued truck drivers. In this case, it appears H&M did its job so well that Fox Valley wanted to offer direct employment to driver Booker.

With respect to the interests of the public, we do not see an adverse impact on those interests on this record. Nothing in the record suggests that the availability of truck drivers was diminished because the employees were precluded from working in the area. More importantly, Fox Valley did not allege in its answer any facts which so suggest. H&M employees are not unreasonably restricted or otherwise hurt by the no-hire clause in this contract. We acknowledge that the existence of paragraph 13 renders former H&M employees who were placed with Fox Valley potentially less desirable hires for Fox Valley because of the liquidated damages that would result from such a hire. However, such potential harm is, on this record, merely speculative. Booker was, in fact, hired by Fox Valley despite the existence of the clause. We are reluctant to deem a contractual provision an unreasonable or excessive restraint of trade on the basis of mere speculation of harm.

In light of the above, we hold that paragraph 13 was not invalid as against public policy. Accordingly, the circuit court did not err in granting H&M’s judgment on the pleadings, as there were no questions of material fact raised by the pleadings.

Conclusion

The circuit court correctly entered judgment for H&M. We therefore affirm the judgment of the appellate court.

Appellate court judgment affirmed.

JUSTICE THOMAS, specially concurring:

Unlike my colleagues in the majority, I find the Wisconsin Supreme Court’s decision in 
Heyde Cos. v. Dove Healthcare, LLC
, 258 Wis. 2d 28, 654 N.W.2d 830 (2002), to be a better reasoned decision than the Virginia Supreme Court’s decision in 
Therapy Services, Inc. v. Crystal City Nursing Center, Inc.
, 239 Va. 385, 389 S.E.2d 710 (1990). Nevertheless, because of an important distinction between 
Heyde
 and the case before us, I feel constrained to concur in the majority’s judgment.

Heyde 
held that a no-hire provision agreed to by employers that restricts the employment opportunities of employees without their knowledge and consent constitutes an unreasonable restraint of trade. It was a matter of record in 
Heyde
 that the employees did not know of the no-hire provision:

“The employees hired by Dove testified in their affidavits that they did not know about the no-hire provision in the Agreement between Greenbriar and Dove that placed restrictions on their ability to be employed by Dove. Some of the employees hired by Dove testified that they inquired whether they would be bound by a non-compete agreement and were told by Greenbriar that they would not be subject to such restrictions.” 
Heyde
, 258 Wis. 2d at 33, 654 N.W.2d at 832.

Here, by contrast, nothing in the record indicates that Booker was unaware of the no-hire provision. On appeal, Fox Valley argues that the provision was “undisclosed.” However, as H&M correctly points out, Fox Valley did not make this assertion in its answer, nor did Booker make the assertion in his affidavit. Thus, there is nothing in the record indicating that Booker was unaware of the no-hire provision.

In my opinion, if the no-hire provision was undisclosed, then the provision would be void as against public policy. The majority is correct that a no-hire provision is not a restrictive covenant. However, as the 
Heyde
 court pointed out, no-hire provisions have the same 
effect
 on employees as restrictive covenants. 
Heyde
, 258 Wis. 2d at 36-37, 654 N.W.2d at 834. Thus, employees should be told of such a provision when they begin their employment. Two employers should not be able to contract away an employee’s future employment opportunities without the employee’s knowledge or consent.

What Booker did here is similar to what millions of Americans do. He took a less than ideal job, and through that job made contacts which allowed him to take a better job. When an employee enters into this situation, he or she should be told of restrictions on future employment opportunities. In this regard, I share the concerns of the concurring justice in 
Heyde
, who wrote the following:

“I write separately to explain that the no-hire contract in the present case severely restricts future employment opportunities of employees without their knowledge or consent. People agreed to work as Greenbriar’s at-will employees (meaning they were free to leave employment at any time and Greenbriar was free to terminate their employment at anytime for almost any reason). When the at-will employment ceased, the former Greenbriar employees would find, to their surprise, that they were handicapped in getting new employment by a secret deal between Greenbriar and another business.

I agree with the court of appeals: ‘The no-hire provision violates public policy by restricting Greenbriar therapists the right [
sic
] to freely sell their skills in the labor market. Without signing any agreement or even being given notice ... current and former Greenbriar therapists are restricted from being employed by these facilities, unless Greenbriar gives consent and unless the facilities are willing to pay the fee.’

To assert that Greenbriar’s employees are not ‘unreasonably restricted or otherwise hurt by the no-hire clause in the contract between Greenbriar and Dove’ is to ignore the harsh realities of the job market. The dissent asks, ‘Why should Dove, which freely agreed to pay the 50 percent premium if it hired a Greenbriar employee, be entitled to avoid its contractual obligations by asserting that someone else has sustained a purely hypothetical injury?’ The law of this State answers this question: freedom to contract, like other freedoms, has limitations.

The limitation on the freedom to contract in the present case is the public’s interest in not allowing businesses to unduly and unfairly limit the ability of former employees to seek new employment. It is an unfair and an undue limitation on an employee’s right to seek employment for an employer to contract away an employee’s freedom of future employment without that employee’s ever knowing about or consenting to the limitation. Employees should be able to decide whether they want to work for Greenbriar under these conditions. The secret deal cut in the present case between two businesses affecting non-consenting employees is unduly harsh and oppressive to the employees and is therefore contrary to the common law and public policy of the state of Wisconsin.” (Emphasis omitted.) 
Heyde
, 258 Wis. 2d at 45-47, 654 N.W.2d at 838-39 (Abrahamson, C.J., concurring).

Although it is true that Booker was in fact hired by Fox Valley, the reality is that liquidated damages provisions such as the one at issue here will make it more difficult for affected employees to obtain new employment. As the 
Heyde
 court held, “[i]t is apparent that a nursing home facility would prefer to hire therapists who are not subject to a 50% salary ‘fee’ that must be paid to a former employer, thereby putting the Greenbriar therapists at a disadvantage in obtaining employment.” 
Heyde
, 258 Wis. 2d at 40, 654 N.W.2d at 836.

The majority is correct that H&M has a legitimate business interest in not being simply an employment agency for its customers, and that the no-hire provision protects H&M’s sole business asset. Slip op. at 9-10. Neither the majority nor H&M, however, has explained why H&M could not accomplish the same thing by entering into the agreement with its employees. This way, H&M’s business interests would be protected 
and
 the employees would not have their future employment opportunities contracted away by others. At the very least, however, I believe that employees should be told of such no-hire provisions when they accept employment. Because in this case it is not a matter of record that the provision was undisclosed, I concur in the majority’s judgment.

JUSTICE RARICK, dissenting:

The law has changed since 
Schumann-Heink v. Folsom
, 328 Ill. 321 (1927), the case cited by the majority at the outset of its substantive analysis. Under Illinois law, contracts in general restraint of trade are now ordinarily held to be void 
Canfield v. Spear
, 44 Ill. 2d 49, 50 (1969); 
Health Professionals, Ltd. v. Johnson
, 339 Ill. App. 3d 1021, 1029 (2003). Exceptions exist in the employment context. Under certain circumstances, an employer may impose contractual restrictions on where and when an employee may work after he leaves the employer’s payroll. Such restrictive covenants, however, are not favored. They must be strictly construed and will be enforced only if their impact on the parties to the agreement and the public is reasonable. See 
Szabo Food Service, Inc. v. County of Cook
, 160 Ill. App. 3d 845, 848 (1987); 
Marwaha v. Woodridge Clinic, S.C
., 339 Ill. App. 3d 291, 294 (2003).

The no-hire provision at issue in this case is tantamount to a restrictive employment covenant, and its validity must be judged by the same standards. To assess whether covenants restricting employment should be upheld, the courts have fashioned specific criteria. The time limit and geographic scope of the restriction must be reasonable, trade secrets or confidential information must be involved, and the restriction must be reasonably necessary for the protection of a legitimate business interest. 
Image Supplies, Inc. v. Hilmert
, 71 Ill. App. 3d 710, 712-13 (1979).

The foregoing conditions are sometimes satisfied in cases involving the performance of professional services or where a person’s employment has enabled him to obtain technical or trade information or customer lists to which he would not otherwise have had access. See Restatement (Second) of Contracts §188, Comment 
g
, at 45-46 (1981). The situation here, however, does not involve such circumstances. The affected employees in this case are truck drivers who possess no unique characteristics that differentiate them from the general pool of truck drivers. As far as we can tell, they acquire no specialized skill or training from plaintiff and possess no trade secrets, customer lists or confidential business information belonging to plaintiff.

There is no indication that the supply of drivers is limited. If one of the drivers leaves plaintiff’s employ, plaintiff can therefore simply hire another to replace him. For plaintiff, the only consequence of losing one of its drivers to a company like defendant’s is that plaintiff will no longer be able to profit from that driver’s labor. The wages earned by the driver will now all be kept by the driver. Plaintiff may consider this unfair, considering that it was responsible for making the initial arrangements that enabled the driver to work for defendant. The free market, however, provides plaintiff with a complete remedy. If it does not wish its drivers to defect to its clients, it can do what other private employers must do to retain employees: it can pay them more. Judicial remedies are unnecessary and inappropriate.

The majority dismisses the harmful effects of plaintiff’s no-hire agreement as “merely speculative.” I doubt that view would be shared by anyone in the trucking industry. Defendant may have hired one of plaintiff’s former drivers, but now that our court has upheld the $15,000 liquidated damages provision in the no-hire agreement, neither defendant nor any other client of plaintiff’s will ever hire another.

The United States Department of Labor, Bureau of Labor Statistics, National Compensation Survey, issued in June of 2003, reports at page 9 that the mean hourly earnings of truck drivers is $14.20 and that the mean number of weekly hours worked is 40.2. Those figures work out to $29,683.68 per year. The $15,000 liquidated damages provision is therefore equivalent to more than half a year’s wages for the average driver. Given that plaintiff’s drivers are not claimed to possess any special knowledge or skill and that qualified drivers are not alleged to be in short supply, no rational successor employer would risk incurring such a penalty. That is not speculation. It is basic dollars and cents.

Although defendant apparently elected not to challenge the validity of the liquidated damages clause when it appealed to the appellate court, the precedential effect of today’s opinion and the interests of maintaining a sound and consistent body of case law suggest that we put aside considerations of waiver and address the issue on the merits. The test for determining whether a liquidated damages clause is valid as such or void as a penalty is stated in section 356 of the Restatement (Second) of Contracts (1981):
 “(1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.”

See
 
Penske Truck Leasing Co. v. Chemetco, Inc.
, 311 Ill. App. 3d 447, 454 (2000); 
Pav-Saver Corp. v. Vasso Corp.
, 143 Ill. App. 3d 1013, 1018-19 (1986).

In 
H&M Driver Leasing Services, Unlimited, Inc. v. Champion International Corp.
, 181 Ill. App. 3d 28, 31 (1989), the appellate court considered a liquidated damages provision which plaintiff attempted to enforce under circumstances directly analogous to those present here. It determined that the provision constituted an unenforceable penalty and that plaintiff was limited to recovering only the actual damages it could prove.

 The provision struck down in 
H&M Driver Leasing Services, Unlimited, Inc. v. Champion International Corporation
 called for a payment of $10,000. Given the similarities between that case and this one, it is difficult for me to see how we can justify upholding the liquidated damages provision here, which is 50% greater. The contract in 
H&M Driver Leasing Services, Unlimited, Inc. v. Champion International Corp
. did allow plaintiff to recover actual damages as well as liquidated damages. Here liquidated damages replace actual damages. In my view, however, the distinction is not dispositive. Although the availability of actual damages in addition to liquidated damages highlights the penal nature of the liquidated damages provision struck down in 
H&M Driver Leasing Services, Unlimited, Inc. v. Champion International Corp
., that provision
 
could not have survived scrutiny under the governing standards even without the actual damages remedy.

The liquidated damages remedy plaintiff attempted to enforce in 
H&M Driver Leasing Services, Unlimited, Inc. v. Champion International Corp.
 suffered from two fundamental problems. Fist, it bore no discernible relationship to any anticipated or actual loss incurred by plaintiff. Second, there is nothing in the case, as far as I can tell, suggesting that proof of plaintiff’s actual loss would have been difficult. The same is true of the present case.

When assessing whether the amount fixed as liquidated damages reasonably approximates anticipated losses, courts look to when the parties made the contract, not to when the contract was breached. Restatement (Second) of Contracts §356, Comment 
b
, at 158 (1981). At the time the parties made this contract, they could not possibly have anticipated that a decision by defendant to hire one of plaintiff’s drivers would have inflicted $15,000 worth of damages on plaintiff’s business.

 In terms of anticipated or actual loss, only two categories of damages might be relevant here. One is lost revenues. The other is the expense of training drivers and placing them with clients. With respect to lost revenues, the scant materials before us suggest that plaintiff’s profits were derived from the differential between what it charged defendant for a driver’s services and what it actually paid the driver. Considering the median earnings of truck drivers, generating $15,000 from a driver’s labor would have taken plaintiff time. Given the sporadic and irregular work hours this driver claims he was assigned, it seems likely that it would have taken considerable time. Plaintiff could therefore claim expected lost revenues of $15,000 only if it had a reasonable expectation that this driver or a similarly compensated replacement driver would continue working for it for a sufficiently long period. The problem is plaintiff had no reasonable expectation that the driver would continue to work for it at all. Plaintiff likewise had no reasonable expectation that defendant would continue to use this driver or a replacement driver supplied by plaintiff. The driver was an at-will employee. He was free to quit at any time, and defendant was free to hire anyone it wanted to take his place. Defendant had no obligation to continue to use drivers provided by plaintiff. The notion that hiring the driver away from plaintiff would cause plaintiff to lose a $15,000 revenue stream is therefore entirely speculative.

With respect to lost training and placement expenses, plaintiff’s claim is equally tenuous. At the time the driver left plaintiff to work for defendant, he had only been on plaintiff’s payroll for one month. There is nothing before us suggesting that plaintiff expended any resources during that time to train or equip him. Although plaintiff presumably processed some paperwork in connection with the driver’s employment, it makes no claim that it was not paid in full by defendant for the driver’s services.

Assuming that plaintiff acted rationally, the differential between what it paid the driver and what it charged defendant for his services would have to be sufficient to enable plaintiff to recover its costs as they were incurred or within a short time thereafter. Rapid, if not immediate, cost recovery was necessary because plaintiff had no assurance that the driver would remain in its employ. Again, he was an at-will employees, free to quit at any time and for any reason. Whether he worked a year, a month, or even just a day, neither he nor defendant had any obligation to reimburse plaintiff for any of its overhead expenses. Accordingly, unless plaintiff recouped its expenses quickly, it risked not being able to recoup those expenses at all. I see no possible reason why plaintiff would have taken such a risk. To the contrary, it seems likely to me that plaintiff had already recovered all of its expenses attributable to the driver by the time the driver went to work for defendant.

Wholly aside from those considerations, this is not a situation where fixing liquidated damages is appropriate on the grounds that proof of actual loss would be difficult. Plaintiff has not explained and I cannot see why proof of actual damages would be any more troublesome here than in any other contract action. If plaintiff did invest resources to train the driver hired by defendant, that is something that can surely be quantified. If it lost a stream of future income, that can surely be quantified as well.

For the foregoing reasons, I would hold that the liquidated damages provision in the no-hire agreement cannot be sustained under Illinois law. “The central objective behind the system of contract remedies is compensatory, not punitive.” Restatement (Second) of Contracts §356, Comment 
a
, at 157 (1981). This liquidated damages provision is simply a penalty. “Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy.” Restatement (Second) of Contracts §356, Comment 
a
, at 157 (1981). Unlike Justice Thomas, I therefore do not believe that the driver’s knowledge of the no-hire provision is dispositive. Whether the driver knew of the provision or not, the contractual liquidated damages remedy is void.

Even if I agreed with Justice Thomas’ view that the validity of the no-hire provision turned on whether it was disclosed to the driver at the time he was hired, I could not concur in the result reached by the majority. In Justice Thomas’ view, entry of judgment in favor of plaintiff was appropriate in this case because nothing in the record shows that the driver was unaware of the no-hire provision when he accepted the job from plaintiff. Concern over the absence of evidentiary support for defendant’s position is also reflected in the majority’s opinion. What my colleagues have all failed to take into account is that we are still at the pleadings stage. There is no evidentiary record.

The dispute before us arose in the context of a motion for judgment on the pleadings pursuant to section 2–615 of the Code of Civil Procedure (735 ILCS 5/2–615 (West 2000)). A section 2–615 motion for judgment on the pleadings is proper only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. 
M.A.K. v. Rush-Presbyterian-St. Luke’s Medical Center
, 198 Ill. 2d 249, 255 (2001). When ruling upon a motion for judgment on the pleadings, a court may consider only (1) facts apparent from the face of the pleadings, (2) matters subject to judicial notice, and (3) judicial admissions in the record. Extrinsic evidence may not be considered. 
M.A.K.
, 198 Ill. 2d at 264.

Because extrinsic evidence may not be considered, the defendant in this case cannot be faulted for having failed to produce a more detailed factual record regarding what the driver knew and when he knew it. What matters at this stage is that nothing apparent from the face of the pleadings, no matters subject to judicial notice, and no judicial admissions made by defendant in the pleadings preclude the possibility that the driver was unaware of the no-hire clause. That being so, we cannot yet say that there is no genuine issue of material fact and that plaintiff is entitled to judgment as a matter of law.

The majority makes one point I do agree with. Whether an agreement is contrary to public policy depends on the particular facts and circumstances of the case. 
O’Hara v. Ahlgren, Blumenfeld & Kempster
, 127 Ill. 2d 333, 341-42 (1989). Defendant had the burden of establishing a public policy defense, and it should have been given the opportunity to prove the relevant facts and circumstances. Through its summary ruling in favor of plaintiff based on the pleadings, the circuit court improperly deprived defendant of that opportunity. Its judgment should not have been affirmed by the appellate court. I would therefore reverse the judgments of the circuit and appellate courts and remand for further proceedings.

FOOTNOTES
1:     
1
We also find distinguishable 
Freund v. E.D.&F. Man International, Inc.
, 199 F.3d 382 (7th Cir. 1999), another case upon which Fox Valley relies. That case concerned an employment agreement between an employer and an employee. A provision in the contract called for the termination of two employees (who were not parties to the agreement) upon the termination of another employee. The Seventh Circuit Court of Appeals, applying Illinois law, held the provision unenforceable because the hardship imposed on the nonsignees, being fired, was a much greater hardship than being foreclosed from alternative employment. 
Freund
, 199 F.3d at 385. We agree and consider 
Freund
 inapposite to the case at bar.

2:     
2
We point out that in 
Heyde
, the majority’s conclusion that the provision constituted an indirect restrictive covenant met with disagreement by both the concurring and dissenting justices. See 
Heyde
, 258 Wis. 2d at 44-46, 654 N.W.2d at 838 (Abrahamson, C.J., concurring); 
Heyde
, 258 Wis. 2d at 47-52, 654 N.W.2d at 839-41 (Sykes, J., dissenting, joined by Bradley, J.).