# Illinois Official Reports

## Appellate Court

---

### *Mulvey v. Carl Sandburg High School*, 2016 IL App (1st) 151615

---

| | |
|---|---|
| Appellate Court Caption | JOSEPH MULVEY and ELLEN HOGAN-MULVEY, Parents and Next Friends of Kathleen Mulvey, a Minor, and for Themselves Personally, and MEGHAN MULVEY, Plaintiffs-Appellants, v. CARL SANDBURG HIGH SCHOOL, CONSOLIDATED SCHOOL DISTRICT 230, DR. JAMES GAY, Individually and as Superintendent of District 230, BRENDA REYNOLDS, Individually and as Assistant Superintendent, CHRIS HELLRUNG, Individually, BRUCE SCHEIDEGGER, Individually, JEAN PACZESNY, Individually, and TODD HELLRUNG, Individually, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-1615 |
| Filed<br>Rehearing denied | October 28, 2016<br>November 29, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-2126; the Hon. John P. Callahan, Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Donald L. Johnson, Julie A. Boyton, and Lawrence P. Seiwert, all of Chicago, for appellants.<br><br>Ancel, Glink, Diamond, Bush, DiCianni & Krafthefer, P.C., of Chicago (Darcy L. Proctor and Brent O. Dezin, of counsel), for appellees. |

JUSTICE DELORT delivered the judgment of the court, with opinion. Presiding Justice Hoffman and Justice Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1    Joseph Mulvey and Ellen Hogan-Mulvey are the parents of Kathleen Mulvey. They filed this lawsuit on behalf of themselves and Kathleen for injuries Kathleen allegedly sustained as the result of school bullying. Kathleen's older sister, Meghan, brought similar claims. These individuals sued Carl Sandburg High School (Sandburg), Consolidated High School District 230 (District 230), and various district officials and coaches. The circuit court ruled in favor of the school district defendants on all claims. We affirm.

¶ 2                              Illinois Bullying Prevention Statute

¶ 3    The Mulveys' claims have their genesis in a 2006 statute which provided that each Illinois school district must "make suitable provisions for instruction in bullying prevention in all grades and include such instruction in the courses of study regularly taught therein." Pub. Act 94-937, § 5 (eff. June 26, 2006) (adding 105 ILCS 5/27-23.7). The legislature later amended the statute to mandate that each Illinois school district create and maintain a policy on bullying to be filed with the State Board of Education (State Board) and "communicate its policy on bullying to its students and their parent or guardian on an annual basis." Pub. Act 95-349, § 5 (eff. Aug. 23, 2007) (amending 105 ILCS 5/27-23.7). School districts are also required to update the policy every two years and file the update with the State Board. 105 ILCS 5/27-23.7(d) (West 2012).

¶ 4    The statute generally defines "bullying" as "any severe or pervasive physical or verbal act or conduct, including communications made in writing or electronically, directed toward a student or students that has or can be reasonably predicted to have the effect of" placing a student in reasonable fear of harm, having a detrimental effect on the student's physical or mental health, or substantially interfering with a student's academic performance or the student's ability to participate in school activities. 105 ILCS 5/27-23.7(b) (West 2012). It also provides that "[n]o student shall be subjected to bullying" while in school, on school property, or during school-related activities. 105 ILCS 5/27-23.7(a) (West 2012).

¶ 5                              District 230 Parent-Student Handbooks

¶ 6    The student handbook distributed to students and parents for the 2010-2011 school year included explicit policies regarding the prevention of bullying and the disciplinary action that school officials may administer when violations occur. The handbook defined bullying as "conduct and behavior toward other students that, to a marked degree, appear to terrorize, intimidate, or start fights with other students. It includes, but is not limited to, engaging in any form or type of aggressive behavior that does physical or psychological harm to someone else and/or using students to engage in such conduct." Policy 7:180 in the student handbook specifically stated that "[p]reventing students from engaging in these disruptive behaviors is an important District goal." The policy required the superintendent or his designee to develop and

maintain a program that "fully implements and enforces" the policy, a function including, among other things: conducting prompt and thorough investigations of alleged incidents of bullying, intimidation, or harassing behavior; providing students who violate the policies with appropriate consequences and remedial action; and protecting students against retaliation for reporting such conduct. It also required bullying prevention instruction in all grades and communication of the policy to all teachers and certified employees.

¶ 7     The policy listed progressive disciplinary actions to be implemented and administered by school officials, as follows: (1) "Dean's referral"; (2) "Notification of parents"; (3) "Completion of form 7:190 E1"; (4) "Out of School Suspension for 1 to 10 days"; (5) "Possible recommendation for expulsion"; and (6) "Possible notification of police." In addition, the student handbook included a point system for progressive discipline in which points were assessed against students based upon the consequences received for a violation of the discipline code. For example, a student who accumulated 30 points would be suspended from school for a period of 10 days.

¶ 8     The student handbook also included a cocurricular code of conduct which provided that "[a] student may be excluded from activities or competition while the school is conducting an investigation regarding that student's conduct. A student found to be in violation of the Code of Conduct while in school, on school property, or at a school-sponsored event, will also be subject to the Consolidated High School District 230 discipline guidelines and consequences."

¶ 9     Students participating in school athletics and their parents also received an athletic handbook. The athletic handbook stated that coaches had a duty to supervise and provide a safe environment, and required them to "control reckless player behaviors. (*before and after games, practices, locker room, and bus supervision*)." (Emphasis in original.)

¶ 10                        Plaintiffs' Amended Complaint

¶ 11     The plaintiffs filed an amended complaint containing three counts. Counts I and III were breach of contract claims based on District 230's alleged failure to enforce the anti-bullying policies in the handbooks. In count I, Meghan and Kathleen set forth a host of allegations of bullying conduct they suffered at the hands of their basketball teammates. They claimed that they were ignored, harassed, humiliated, physically assaulted, injured, and intimidated by their teammates during their high school tenure. They also alleged that certain teammates teased them on specific occasions, both in person and on social media.

¶ 12     The sisters alleged that they performed all the duties and obligations required of them by the student and athletic handbooks, but that the defendants failed to understand and rectify the conditions that fostered bullying, intimidation, and harassment. They further alleged that they suffered damages due to the defendants' breaches of contract, including physical injury, emotional pain and distress, depression, post traumatic stress disorder, surgery, and having to change schools prior to graduation. Count III realleged the same claims as Count I, but on behalf of the plaintiff-parents.

¶ 13     Count II of the amended complaint alleged willful and wanton conduct on behalf of Meghan and Kathleen against all defendants. This count claimed that, beginning as early as November 2008 and continuing thereafter, defendants knew or acted with utter indifference and reckless disregard to the bullying conduct. They claimed that but for the willful and wanton failure of defendants to address the bullying conduct as required by common law, Illinois statutes, and District 230's policies, they would have been protected from the known

danger of bullying and would not have suffered the injuries inflicted on them.

¶ 14                    Defendants' Motion to Dismiss the Amended Complaint

¶ 15        Defendants filed a combined motion to dismiss the amended complaint pursuant to section 2-619.1 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2012)). They asked the court to dismiss counts I and III pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)) contending that, as a matter of law, public school student handbooks do not possess the elements of a legal contract: offer, acceptance, and consideration. They also moved to dismiss count II pursuant to section 2-615 for failure to state a valid cause of action for willful and wanton conduct because it did not allege a known threat of serious physical harm and because plaintiffs' allegations eliminated any claim of deliberate indifference to any alleged threat. Finally, defendants moved to dismiss count II on two bases. They argued under section 2-619(a)(5) (735 ILCS 5/2-619(a)(5) (West 2012)) that Meghan's claims were time-barred, and under section 2-619(a)(9) (735 ILCS 5/2-619(a)(9) (West 2012)) that defendants were immune from claims regarding their decisions to impose bullying discipline pursuant to section 2-201 of the Illinois Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-201 (West 2012)).

¶ 16        The circuit court denied defendants' motion on counts I and III, finding that they pled a valid cause of action for breach of a contract existing between plaintiffs and defendants. The court dismissed count II without prejudice, with leave for plaintiffs to file an amended complaint containing greater specificity regarding notice.

¶ 17        Defendants moved to reconsider the circuit court's decision to deny their motion to dismiss the breach of contract claims. The court denied defendants' motion to reconsider and ordered defendants to file an answer to the amended complaint and complete written discovery.

¶ 18                    Defendants' Answer to Plaintiffs' Amended Complaint

¶ 19        Plaintiffs' amended complaint contained an allegation reading in part: "[t]he School Handbook and Athletic Handbook form contracts between the School, its students and their parents." Defendants answered, "Defendant admits only that any such Handbook speaks for itself." With leave of court, defendants later filed an amended answer to plaintiffs' amended complaint, answering to the same allegation, "Defendant admits the allegations contained in paragraph 13, but denies that the Handbook creates a legal duty, cause of action or contract." In their affirmative defenses, defendants further asserted any alleged contract would be void because it was not supported by valid consideration.

¶ 20                    Defendants' Motion for Judgment on the Pleadings

¶ 21        Defendants then moved for judgment on the pleadings pursuant to section 2-615(e) of the Code, arguing again that, as a matter of law, public school handbooks cannot form the basis of a contract. They contended that the creation and distribution of the student and athletic handbooks did not establish the elements of contract formation and that the application of employment handbook principles in a public school setting would significantly undermine the State's ability to operate public schools. The circuit court granted defendants' motion and dismissed the breach of contract claims (counts I and III) in the amended complaint. The court

allowed plaintiffs to again amend their complaint.

¶ 22                                    Plaintiffs' Second Amended Complaint
¶ 23        Plaintiffs then filed a second amended complaint. It realleged the breach of contract counts (counts I and III) that had been previously dismissed, to preserve the propriety of their dismissal for purposes of appeal. Count II was a willful and wanton conduct claim. Defendants moved to dismiss count II pursuant to section 2-619(a)(9) of the Code, arguing that they were immune from claims stemming from their discretionary implementation of the anti-bullying policies. Defendants also contended that Meghan's willful and wanton claim in count II was subject to a one-year statute of limitations under section 8-101 of the Tort Immunity Act and thus was time-barred.

¶ 24        The court dismissed this count as to all plaintiffs on tort immunity grounds. It also found that Meghan's claim was time-barred. Upon the dismissal of count II of the second amended complaint, no further claims were pending.

¶ 25        Plaintiffs timely appealed from: (1) the order granting defendants' motion for judgment on the pleadings, which dismissed counts I and III of plaintiffs' amended complaint alleging breach of contract; (2) the order denying plaintiffs' motion to reconsider and vacate the order dismissing those counts; and (3) the order granting defendants' section 2-619 motion to dismiss count II of plaintiffs' second amended complaint.

¶ 26                                                ANALYSIS
¶ 27                                        Breach of Contract Claims
¶ 28        A court properly enters a judgment on the pleadings when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *H&M Commercial Driver Leasing, Inc. v. Fox Valley Containers, Inc.*, 209 Ill. 2d 52, 56 (2004). "Only those facts apparent from the face of the pleadings, matters subject to judicial notice, and judicial admissions in the record may be considered." *Id.* at 56-57. "Moreover all well-pleaded facts and all reasonable inferences from those facts are taken as true." *Id.* at 57. "On appeal, the reviewing court must determine whether any issues of material fact exist and, if not, whether the movant was, in fact, entitled to judgment as a matter of law." *Id.* We review the entry of a judgment on the pleadings *de novo*. *Id.*

¶ 29        To state a cause of action for breach of contract, the plaintiff must allege facts establishing that the parties exchanged an offer, an acceptance, and consideration. *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 489 (1987). In *Duldulao*, our supreme court held that "an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present." *Id.* at 490. Three requirements must be met for an employee handbook or policy statement to form a contract. First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by "commencing or continuing to work after learning of the policy statement." *Id.* The *Duldulao* court held, "When these conditions are present, then the employee's continued work constitutes consideration for the

promises contained in the statement, and under traditional principles a valid contract is formed." *Id.*

¶ 30    In particular, the *Duldulao* court found that an employee handbook created an enforceable *c*ontract right because the document contained specific language regarding the termination of permanent employees. *Id.* at 490-91. The handbook stated that termination of a permanent employee " '*cannot occur* without proper notice and investigation.' " (Emphasis in original.) *Id.* at 491.

¶ 31    The parents contend that this case parallels *Duldulao*. They argue that the bullying prevention provisions in the student handbook and athletic handbook were legal offers, which they accepted when they enrolled their daughters at Sandburg. They also contend that students accepted the handbook "offers" by attending the school and participating in athletic programs. They rely strongly on specific handbook language providing that the district's "progressive discipline policy *** is consistently and fairly applied" and that "[t]he Superintendent or designee shall develop and maintain [an anti-bullying] program." Thus, they contend that the student handbook formed a valid contract on the same basis as the employee handbook did in *Duldulao*.

¶ 32    The legal framework governing students' attendance at public schools reveals, however, that the plaintiffs' contract analogy is particularly inapt in the public school context. The student handbook provisions cited above are merely hortatory and convey no specific promises. The student handbook specifically states "*[i]t is the hope* of the District 230 administration that students involved in our schools will develop skills to manage their behavior effectively as a result of interventions designed and implemented by the PPS (Pupil Personnel Services) staff." (Emphasis added.) Unlike the employee handbook in *Duldulao*, which included specific language regarding the termination of employees, the language in the student handbook does not include any specific *promise* to prevent or eliminate bullying. Instead, Policy 7:180 states that "[p]reventing students from engaging in these disruptive behaviors is *an important District goal*." (Emphasis added.) The creation, implementation, and enforcement of a policy prohibiting bullying, as required by State law, simply does not promise students and parents that attendance at the school guarantees the complete absence of bullying conduct, nor that every student engaging in such conduct will be disciplined in a particular manner. We note that this court has found that private school conduct policies do not constitute a legal offer to protect students from all such behavior. See *Harris v. Adler School of Professional Psychology*, 309 Ill. App. 3d 856, 861 (1999) (finding the Adler School's non-discrimination policy was a statement of adherence to existing law and did not constitute an independent contractual obligation).

¶ 33    In sum, the policies do not promise that defendants will take any particular action in any specific circumstance. The handbooks contain no language clear enough to lead a reader to believe that defendants agreed to act in any particular way in response to a specific set of circumstances, or that they agreed to enforce violations of the prohibitions contained in the handbook in any particular manner. Accordingly, the handbooks do not create an offer sufficient to support a valid contract between the parties.

¶ 34    We next address the issue of consideration. The plaintiffs appear to argue that the attendance of Kathleen and Meghan as students at Sandburg amounted to consideration. They also claim that they provided consideration by "paying for" public school tuition through their property taxes, and by declining to exercise other educational options available to them.

¶ 35    Consideration must consist of something of detriment or disadvantage to one party or benefit to the other, and the bargained-for exchange between them. *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330 (1977). Performing an act which one is legally obligated to do is not consideration that could support a contract because there is no detriment. *Johnson v. Maki & Associates, Inc.*, 289 Ill. App. 3d 1023, 1028 (1997). School attendance can hardly be a legal detriment or disadvantage to a student, because the student must attend school until age 17 unless she has already graduated. 105 ILCS 5/26-1 (West 2012). And "[i]n all matters relating to the discipline in and conduct of the schools and the school children, [school employees] stand *in the relation of parents and* guardians to the pupils." (Emphasis added.) 105 ILCS 5/24-24 (West 2012). Indeed, the nature of a school's role is custodial and tutelary, permitting a degree of supervision and control that is not exercised over free adults. *Vernonia School District 47J v. Acton*, 515 U.S. 646, 655 (1995).

¶ 36    Nor can a student's attendance be deemed a benefit to either the school district or the public high school which she attends. Unlike private schools, which charge tuition, public schools are required by law to provide free education to students living within the school district. Ill. Const. 1970, art. X, § 1. The cost of that education is defrayed by tax dollars, not tuition paid by the students. The plaintiffs also argue that consideration in this case is established by the mutuality of obligations contained in the handbooks. Suffice it to say that the obligations of students as set forth in the handbooks are not part of a bargained-for exchange. Instead, those obligations are a unilateral directive from the school district upon the students. For these reasons, neither the parties' mutual relationship nor the handbooks established consideration sufficient to support the existence of a valid contract.

¶ 37    Even so, plaintiffs contend that we need not engage in an offer/acceptance/consideration analysis at all because the defendants judicially admitted there was a binding contract between the parties. In their answer to the amended complaint, defendants admitted plaintiffs' allegation that "[t]he School Handbook and Athletic Handbook form contracts between the School, its students, and their parents" but they then denied "the Handbook creates a legal duty, cause of action, or contract."

¶ 38    "Judicial admissions are formal admissions in the pleadings that have the effect of withdrawing a *fact* from issue and dispensing wholly with the need for proof of the fact." (Emphasis added.) *Konstant Products, Inc. v. Liberty Mutual Fire Insurance Co.*, 401 Ill. App. 3d 83, 86 (2010). Contract formation is a question of law to be determined by the court. *Doyle v. Holy Cross Hospital*, 289 Ill. App. 3d 75, 78 (1997). Accordingly, the existence of a valid contract is not a "fact" which the school district conceded through the admission in its answer.

¶ 39    In sum, we find that the circuit court did not err when it granted defendants' motion for judgment on the pleadings and dismissed plaintiffs' breach of contract claims in counts I and III of the amended complaint because the plaintiffs failed to demonstrate the existence of a valid contract based on the exchange of an offer, acceptance, and consideration. It necessarily follows that the court did not err when it denied plaintiffs' motion to reconsider and vacate that order.

¶ 40                              Willful and Wanton Conduct Claim

¶ 41    We now turn to plaintiffs' claim for willful and wanton conduct which the circuit court dismissed as barred by the Tort Immunity Act. Defendants' motion to dismiss count II was filed pursuant to section 2-619 of the Code. "A section 2-619 motion admits as true all

well-pleaded facts, along with all reasonable inferences that can be gleaned from those facts." *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 352 (2008). "[W]hen ruling on a section 2-619 motion to dismiss, a court must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party." *Id.* We review orders from a section 2-619 dismissal *de novo*. *Id.*

¶ 42      This count alleges that although defendants had actual notice of the bullying conduct because it occurred in their presence, they acted with utter indifference and reckless disregard to it by allowing it to continue unrestrained. The Tort Immunity Act protects local public entities and public employees from liability arising from the operation of government. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 368 (2003). The law seeks "to prevent the dissipation of public funds on damage awards in tort cases." *Id.* The Tort Immunity Act is in derogation of common law and, therefore, must be strictly construed. *Id.* Accordingly, unless an immunity provision applies, government entities are liable in tort to the same extent as private parties. *Id.* at 368-69.

¶ 43      Section 2-201 of the Tort Immunity Act states:

> "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2012).

This provision immunizes governmental bodies from "liability for both negligence and willful and wanton misconduct." *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 196 (1997). Section 2-109 of the Tort Immunity Act further provides that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2012).

¶ 44      Thus, "sections 2-201 and 2-109 grant absolute immunity to public entities for the performance of discretionary functions [citation], but not ministerial functions." *Malinski v. Grayslake Community High School District 127*, 2014 IL App (2d) 130685, ¶ 8 (citing *Kennell v. Clayton Township*, 239 Ill. App. 3d 634, 640 (1992), and *Village of Itasca v. Village of Lisle*, 352 Ill. App. 3d 847, 859 (2004)). "The distinction between a discretionary act and a ministerial act must be made on a case-by-case basis, and courts have recognized that discretionary acts are those that are unique to a particular public office, whereas ministerial acts are those that a person performs based on a given set of facts, in a prescribed manner, in accordance with a mandate of legal authority, and without reference to the official's discretion as to the propriety of that act." *Id.*

¶ 45      Our supreme court has established a two-part test to determine which employees may be granted immunity under section 2-201 of the Tort Immunity Act. First, an employee may qualify for immunity "if he holds *either* a position involving the determination of policy *or* a position involving the exercise of discretion." (Emphases in original.) *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 341 (1998). If the employee satisfies the first part of the test, he must then show he engaged in both the determination of policy and the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted. *Id.* Plaintiffs do not contest that defendants hold positions involving the determination of policy or the exercise of discretion. Therefore, we will consider the second part of the test.

¶ 46    Plaintiffs argue that the defendants' duties were ministerial functions to which immunity did not attach. As an example, they specifically point to the student handbook's progressive disciplinary policy, which includes an assigned point system for violations. Plaintiffs contend that the individual defendants, including administrators, coaches, and guidance counselors, were not engaged in the determination of public policy in failing to discipline the bullying students because they were merely left to implement the ministerial task of the designated policies established by the school board and apply them in a consistent manner.

¶ 47    The appellate court has twice found that this immunity provision applies to bar claims brought regarding failure of school officials to discipline school bullies. In *Hascall v. Williams*, 2013 IL App (4th) 121131, the court held that, despite the existence of an anti-bullying policy similar to the one at issue here, the acts or omissions at issue constituted discretionary acts and policy determinations, not ministerial acts, which were protected under section 2-201 of the Tort Immunity Act. *Id.* ¶ 25. Similarly, in *Malinski*, the court concluded that "an anti-bullying policy is not required to mandate a particular response to a specific set of circumstances. Instead, a policy may afford a school district with the discretion to determine whether bullying has occurred, what consequences will result, and any appropriate remedial actions." *Id.* ¶ 13.

¶ 48    We find the reasoning in *Hascall* and *Malinski* persuasive. The anti-bullying policy at issue here includes: "(a) conducting a prompt and thorough investigation of alleged incidents of bullying, intimidation, or harassing behavior, (b) providing each student who violates one or more of these policies with appropriate consequences and remedial action, and (c) protecting students against retaliation for reporting such conduct." This policy, which is strikingly similar to the anti-bullying policy in *Hascall*, and its implementation, is discretionary in nature and does not mandate a specific response to every set of circumstances.

¶ 49    Furthermore, the policy outlining the disciplinary point system that plaintiffs claim as evidence of ministerial application requires a discretionary determination of whether a particular violation occurred and the appropriate consequences and remedial action to be applied under the facts. The policy states "points are given to the student based upon the *consequences* he/she receives for his/her violation of policy." (Emphasis added.) In other words, a District 230 employee must determine whether the student committed a violation and what the consequences would be for the violation before a "point value" is assigned and recorded. A particular point value for a suspension cannot be assigned without a District 230 employee having first determined whether a student should be suspended for a violation of the disciplinary policy. Contrary to plaintiffs' argument, the implementation of the disciplinary policy involves more than a ministerial task.

¶ 50    In their reply brief, plaintiffs cite a recent decision, *Barr v. Cunningham*, 2016 IL App (1st) 150437, in support of their claim. In *Barr*, a student sued his high school and physical education teacher, alleging willful and wanton conduct because he was injured after the school failed to provide him with protective eyewear for a floor hockey game. The circuit court granted the defendants' motion for directed verdict on the willful and wanton conduct claim. This court, in reversing that decision, found, in part, under section 2-201, that even if the teacher exercised discretion by declining to require students to wear goggles, the record did not show that this exercise of discretion constituted a policy decision within the meaning of the statute. *Barr*, 2016 IL App (1st) 150437, ¶ 28.

¶ 51    *Barr* is distinguishable. Here, plaintiffs base their claim of willful and wanton conduct on the anti-bullying policies already in place, rather than the individual defendants' failure to engage in the determination of policy. Even if plaintiffs specifically pled that the individual defendants never made a favorable policy determination, their claim would still fail. Our supreme court has previously defined policy decisions in the tort immunity context as those decisions which require the public entity " 'to balance competing interests and to make a judgment call as to what solution will best serve each of those interests.' " *Harinek*, 181 Ill. 2d at 342 (quoting *West v. Kirkham*, 147 Ill. 2d 1, 11 (1992)). The conduct described in plaintiffs' second amended complaint meets this definition. According to the Sandburg student handbook, "parents, teachers and school officials are all partners in helping students acquire self-discipline," and that "teachers are the first resource in fostering an orderly school atmosphere." Accordingly, it is clear that teachers and school administrators must balance various interests which may compete for the time and resources of the school district, including the interests of student safety. Therefore, *Barr* does not require a different result. The circuit court properly dismissed count II of the second amended complaint.

¶ 52                    Application of the Statute of Limitations to Meghan's Tort Claim
¶ 53    Finally, plaintiffs argue that the circuit court erred by finding Meghan's tort claim was time-barred. Plaintiffs contend Meghan had two years to bring her claim from the time she turned 18 pursuant to section 13-211 of the Code. 735 ILCS 5/13-211 (West 2012). Defendants argue the one-year statute of limitations under section 8-101 of the Tort Immunity Act (745 ILCS 10/8-101 (West 2012)) applies. Because we have found that Meghan's claim is barred by the discretionary activity provision of the Tort Immunity Act, we need not resolve this conflict and therefore do not address this issue.

¶ 54                                         CONCLUSION
¶ 55    For these reasons, we affirm the judgment of the circuit court.

¶ 56    Affirmed.