**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | |
|---|---|
| PITTSBURGH LOGISTICS SYSTEMS, INC., | : No. 31 WAP 2019 |
| | : |
| | : Appeal from the Order of the |
| Appellant | : Superior Court entered January 11, |
| | : 2019 at No. 134 WDA 2017, |
| | : affirming the Order of the Court of |
| v. | : Common Pleas of Beaver County |
| | : entered December 22, 2016 at No. |
| | : 11571 of 2016. |
| BEEMAC TRUCKING, LLC AND BEEMAC | : |
| LOGISTICS, LLC, | : SUBMITTED: April 16, 2020 |
| | : |
| Appellees | : |


**OPINION**


**JUSTICE MUNDY**                                **DECIDED: APRIL 29, 2021**

In this appeal we consider whether no-hire, or "no poach," provisions that are ancillary to a services contract between business entities are enforceable under the laws of this Commonwealth. For the reasons that follow, we hold the no-hire provision in this case is not enforceable, and therefore affirm the order of the Superior Court.

I.

Pittsburgh Logistics Systems, Inc. ("PLS") is a third-party logistics provider that arranges for the shipping of its customers' freight with selected trucking companies. Beemac Trucking ("Beemac")[1] is a shipping company that conducts non-exclusive business with PLS.

---

[1] Although Beemac Logistics appears in the caption, no injunctive relief was ordered against it. Accordingly, it is not involved in the instant appeal.

On August 30, 2010, PLS and Beemac entered into a one-year Motor Carriage Services Contract ("the Contract"), which automatically renewed on a year to year basis until either party terminated it. Contract, 8/30/10, at 2. It contained both a non-solicitation provision and the no-hire provision, which is the focus of this appeal. Those provisions are as follow:

> 14.3 The parties acknowledge that during the term of the Contract there may be disclosed to CARRIER [Beemac] confidential information concerning PLS' operations including, but not limited to, the names and addresses of Shippers and others who are clients of PLS, volumes of traffic and rate data. During the term of this Contract and for a period of one year after termination of this Contract, CARRIER hereby agrees that it will not, either directly or indirectly, solicit any individual Shipper or other client of PLS, back-solicit and/or transport for itself, without the involvement of PLS, any freight that CARRIER handles pursuant to this Contract or freight which first becomes known to CARRIER as a result of CARRIER'S past, present or future dealings with PLS.
>
> . . .
>
> 14.6 CARRIER agrees that, during the term of this Contract and for a period of two (2) years after the termination of this Contract, neither CARRIER nor any of its employees, agents, independent contractors or other persons performing services for or on behalf of CARRIER in connection with CARRIER'S obligations under this Contract will, directly or indirectly, hire, solicit for employment, induce or attempt to induce any employees of PLS or any of its Affiliates to leave their employment with PLS or any Affiliate for any reason.

*Id.* at 9-10.

While the contract was in force, Beemac hired the following four PLS employees: Michael Ceravolo, Mary Coleman, Natalie Hennings, and Racquelle Pakutz. On November 29, 2016, PLS filed an action in the Court of Common Pleas of Beaver County against Beemac alleging breach of contract, tortious interference with contract, violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. §§ 5301 - 5308, and civil

conspiracy. PLS sought injunctive relief, and on December 1, 2016, the court issued an order enjoining Beemac from employing the former PLS employees and soliciting PLS customers pending a hearing.

In a related action, on November 18, 2016, PLS sued its former employees for breach of contract, alleging they had breached the non-competition and non-solicitation provisions of their employment contracts. On November 22, 2016, the court entered an order enjoining the former employees from employment with Beemac and soliciting certain PLS customers pending a hearing.

On December 8, 9, and 13, 2016, the court held a consolidated hearing on both actions, and on December 22, 2016, it vacated the injunction entered against Ms. Coleman because it determined that her employment agreement was void. It also concluded that the other three employees had valid employment agreements but that the worldwide non-compete clauses in their contracts were "unduly oppressive and cannot be subject to equitable modification." Trial Court Opinion, 12/22/2016, at 10. However, the court found that the provisions of the employment agreements which precluded Mr. Ceravolo from soliciting clients of PLS for one year, and Ms. Hennings and Ms. Pakutz from soliciting clients of PLS for two years, were reasonable. Accordingly, the court ordered no injunctive relief against Ms. Coleman, and enjoined the other three employees only from soliciting PLS clients in accordance with their employment agreements. The order specified that the employees were not enjoined from working for Beemac.[2]

With respect to the PLS action against Beemac, the court first addressed Section 14.3 of the Contract governing non-solicitation of PLS customers:

---

[2] The injunction entered in PLS's action against its former employees is not the subject of the instant appeal. Rather, PLS properly filed a separate appeal to the Superior Court which affirmed the trial court. *Pittsburgh Logistics Sys., Inc. v. Ceravolo*, No. 135 WDA 2017, 2017 WL 5451759 (Pa. Super. Nov. 14, 2017), *petition for allowance of appeal denied*, 183 A.3d 968 (Pa. 2018) (per curiam).

[R]estrictions on trade are not always favored by the courts. Indeed, the Pennsylvania Supreme Court acknowledged that "it has long been the rule at common law, that contracts in restraint of trade made independently of a sale of a business or contract of employment are void as against public policy regardless of the valuableness of the consideration exchanged. *Jacobson & Co. v. Int'l Env't Corp.*, 236 A.2d 612, 617 (Pa. 1967). However, certain restrictive covenants are valid if they are ancillary to the main purpose of the contract. *Id.* The covenant must be inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits, he may suffer from the unrestrained competition of the other. *Id.* The main purpose of the contract must suggest the measure of protection needed, and furnish a sufficiently uniform standard by which the validity of such a restraint may be judicially determined. *Id.* We believe that the restrictive covenant in section 14.3 of the . . . Contract meets these requirements; it was ancillary to the main purpose of the agreement, and [it] was necessary to protect PLS's interest in its customers.

In the instant case, the covenant contained in section 14.3 furthered PLS's legitimate interest in preventing Bee[m]ac from cutting PLS out of the equation.

Trial Court Opinion, 12/22/16, at 11-12.

With respect to Section 14.6, the court noted the lack of "case law in Pennsylvania on the issue of no-hire covenants between contracting companies." *Id.* at 13. It recognized that while some states have found such provisions to be void against public policy, *e.g.*, *Heyde Cos., Inc. v. Dove Healthcare LLC*, 654 N.W.2d 830 (Wis. 2002), others have deemed them to be a permissible restraint on trade, *e.g.*, *H & M Commercial Driver Leasing, Inc. v. Fox Valley Containers, Inc.*, 805 N.E.2d 1177 (Ill. 2004). The court concluded:

We believe these types of no-hire contracts should be void against public policy because they essentially force a non-compete agreement on employees of companies without their consent, or even knowledge, in some cases. We believe that if an employer wishes to limit its employees from future competition, this matter should be addressed directly between the employer and employee, not between competing

businesses. Moreover, in this case, such a restriction goes beyond the protected interest of PLS, which is its customers. So long as the former employee, or any employee of Bee[m]ac, does not contact former customers of PLS, for the time period in the contract, in this case one year under section 14.3 of the . . . Contract, there is no need to enforce the no-hire provision contained in Section 14.6. For these reasons, we do not believe PLS has a substantial likelihood of success on the merits of its claim under section 14.6, and we will vacate the injunction prohibiting Bee[m]ac . . . from hiring former PLS employees.

Trial Court Opinion, 12/22/16, at 13.

PLS filed an appeal to the Superior Court, which issued an *en banc* opinion on January 11, 2019, affirming the trial court. *Pittsburgh Logistics Sys. v. Beemac Trucking, LLC*, 202 A.3d 801 (Pa. Super. 2019) (en banc).[3] The Superior Court recognized that pursuant to *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000 (Pa. 2003), it exercises a highly deferential standard of review with respect to the grant or denial of a preliminary injunction, and examines the record to determine if the trial court had any apparently reasonable grounds for its action.

The court noted:

Here, there is no proof that the employees knew of the [no-hire] clause between the companies. While there was a restrictive covenant in the employees' contracts with PLS, the trial court determined it was unenforceable as being oppressive or an attempt to foster a monopoly, thereby demonstrating unclean hands on the part of PLS. It would be incongruous to strike the employees' restrictive covenant, finding PLS to have had unclean hands, yet allow PLS to achieve the same result via the contract between companies.

*Pittsburgh Logistics Sys.*, 202 A.3d at 807 (citations omitted).

The court agreed with the trial court that "Paragraph 14.6 violated public policy by preventing non-signatories, PLS employees, from exploring alternate work opportunities

_____

[3] A panel of the Superior Court affirmed the trial court on March 26, 2018. PLS sought reargument, which the court granted on June 6, 2018.

in a similar business." *Id.* at 808. Furthermore, "each [motor carriage service contract] with a new carrier, results in a new restriction upon current employees[.]" *Id.* While such restrictions may be valid in a contract made between an employer and employee at the time of hiring, a new restriction must be supported by additional consideration. *Id.* Therefore, the court concluded, "[i]f additional restrictions to the agreement between employer and employee are rendered unenforceable by a lack of additional consideration, PLS should not be entitled to circumvent that outcome through an agreement with a third party." *Id.*

In a dissenting opinion, Judge Bowes observed that Section 14.6 "is a no-hire provision that binds Bee[m]ac, not a non-compete clause binding PLS's employees. In my view, the majority errs in conflating the two, as there is no basis in Pennsylvania law for treating a no-hire provision as a restrictive covenant between an employer and an employee." *Pittsburgh Logistics Sys.*, 202 A.3d at 810 (Bowes, J. dissenting). The dissent asserted that Section 14.6 is not:

> a back-door restrictive covenant through which an employer signs away rights of its employees without supplying consideration. The no-hire provision does not restrict the employees' actions, but rather is a concession from Bee[m]ac that, in exchange for its access to PLS's specialized industry knowledge and contacts through PLS's employees, Bee[m]ac would not thereafter appropriate those employees and obviate the need for PLS's services. Bee[m]ac's contract with PLS does nothing to restrict PLS's employees from seeking employment with any other company.

*Id.* at 811. Instead, the dissent opined, "[t]he proper analysis of the issue in this appeal is whether the no-hire provision in the PLS-Bee[m]ac contract is a reasonable restraint upon trade." *Id.* Upon review of cases from other jurisdictions and an unpublished opinion from a federal district court, *GeoDecisions v. Data Transfer Solutions, LLC*, 2010 WL 5014514 (M.D. Pa. Dec. 3, 2010), the dissent concluded the restraint on trade was indeed

reasonable. *Id.* at 811-13. The dissent also noted that while the agreement "had an indirect effect on those PLS employees seeking employment away from PLS . . . [it] prohibited [them] only from seeking employment with Bee[m]ac and its affiliates who deal with PLS." *Id.* at 113. Such limitation, the dissent concluded, does not violate public policy.

We granted allowance of appeal to address the following issue: "Are contractual no-hire provisions which are part of a services contract between sophisticated business entities enforceable under the law of this Commonwealth?" *Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC & Beemac Logistics, LLC*, 216 A.3d 1032 (Pa. 2019) (per curiam).

II.

Due to the lack of Pennsylvania case law governing no-hire provisions, it is helpful to review the decisions from other jurisdictions on which the parties and lower courts rely. We begin with cases where the courts found such provisions unenforceable.

In *Heyde*, Greenbriar Rehabilitation (Greenbriar), a provider of rehabilitation services to nursing homes, entered into an agreement to place physical therapists at a Dove Healthcare (Dove) facility. The agreement contained a provision that Dove would not hire any Greenbriar therapists or therapist assistants for the duration of the contract and for a period of one year thereafter without the written consent of Greenbriar. If, after receiving Greenbriar's written consent Dove hired any Greenbriar therapists or therapist assistants, Dove would pay Greenbriar a fee of fifty percent of the Greenbriar employee's annual salary. On October 26, 1999, Dove terminated the agreement effective December 31, 1999. Shortly after terminating the agreement, Dove hired one current and three former Greenbriar employees without obtaining Greenbriar's written consent nor paying the fee outlined in the agreement.

Greenbriar filed suit against Dove on March 10, 2000, asserting that Dove breached the no-hire provision of the contract. The circuit court found for Greenbriar, awarding damages of $62,124.40 in its favor. However, as noted by the Wisconsin Supreme Court, "the court of appeals reversed the judgment of the circuit court and held that the no-hire provision was an unreasonable restraint of free trade because the employees had no knowledge of the provision and did not sign any covenant not to compete." *Heyde*, 654 N.W.2d 830 at 833.

The Wisconsin Supreme Court noted that restrictive covenants not to compete in employment contracts are permitted by statute but, "only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this subsection, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint." W.S.A. 103.465. "While a covenant not to compete is typically made between an employer and its employees, it is possible, as illustrated in this case, that a restrictive covenant may be made between employers that acts as a covenant not to compete on the employees." *Heyde*, 654 N.W.2d at 834. As summarized by the court:

> The *effect* of the no-hire provision is to restrict the employment of Greenbriar's employees; it is inconsequential whether the restriction is termed a "no-hire" provision between Dove and Greenbriar or a "covenant not to compete" between Greenbriar and its employees. Greenbriar is not allowed to accomplish by indirection that which it cannot accomplish directly.

*Id.* Because the no-hire provision acted as a restrictive covenant on Greenbriar's employees, the court concluded that the restrictive covenant must be necessary to protect the employee; provide a reasonable time limit; provide a reasonable territorial limit; not be harsh or oppressive to the employer; and not be contrary to public policy. *Id.* at 835. With respect to the first factor, the court held that the no-hire provision was not necessary

for Greenbriar's protection because it could have protected itself through a reasonable covenant not to compete with its employees. The court noted that the one-year time limit appeared reasonable, but reached no conclusion with respect to the territorial limit. However, it determined the no-hire provision was harsh and oppressive to the employees because they had no knowledge of it and did not sign a non-compete. *Id.* at 837. The no-hire provision was contrary to public policy for the same reason, and because it violated "the fundamental right of a person to make choices about his or her own employment." *Id.* at 836.

The California Court of Appeal addressed no-hire contracts in *VL Systems, Inc. v. Unisen, Inc.*, 152 Cal. App. 4th 708 (Cal. Ct. App. 2007). VL Systems (VLS) was a provider of computer consulting services. In 2004, it entered into a contract with Star Trac to provide assistance for migrating to a new server. It estimated the work would be completed in sixteen hours.

The contract contained a provision that Star Trac would not attempt to hire VLS's personnel, and, "if, during the term of, or within twelve (12) months after the termination of the performance period of this agreement, [Star Trac] hires directly, or indirectly contracts with any of the seller's personnel for the performance of systems engineering and/or related services," VLS would be entitled to liquidated damages as detailed in the agreement. *Id.* at 710.

In April 2004, after the Star Trac contract was completed, VLS hired David Rohnow as a senior engineer. In July 2004, Star Trac posted an internet job listing for a director of information technology. Rohnow responded, was hired and began working for Star Trac on September 20, 2004. He had worked for VLS for twenty-two weeks.

VLS billed Star Trac for liquidated damages, which it refused to pay. VLS filed an action against Star Trac that proceeded to trial. The court determined that Star Trac

breached the agreement, but concluded that the liquidated damages set forth in the contract did not bear a reasonable relation to the damage occurred. Instead, it entered judgment in favor of VLS in the amount of $28,500, which equaled 60 percent of the $47,500 salary Rohnow received from Star Trac during the amount of time he worked for VLS.

The Court of Appeal reversed. The court noted Business and Professions Code Section 16600, which states, "[e]xcept as provided in this chapter, every contact by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. "California courts have consistently declared this provision an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice." *VL Systems*, 152 Cal. App. 4th at 713. While recognizing that "[f]reedom of contract is an important principle, and courts should not blithely apply public policy reasons to void contract provisions," it noted:

> This type of contractual provision, however, may seriously impact the rights of a broad range of third parties. In this case, those third parties not only included the VLS employees who actually performed work for Star Trac under the contract, but all of those who did not, including Rohnow, who was not even employed by VLS at the time.

*Id.* While "[c]ourts have upheld narrowly drawn provisions which might limit the employment mobility of nonparties," *id.* at 714, the court noted that the contract at issue contains "a very broad provision covering not only solicitation by Star Trac, but all hiring, and it applies to all VLS employees, regardless of whether they worked for Star Trac or were even employed at the time." *Id.* at 718. Thus, the California Court of Appeal expressed its disapproval of an agreement between businesses that "results in a situation where the opportunities of employees are restricted without their knowledge and consent." *Id.*

Nearly seventy years ago, a Texas appellate court addressed the issue in *Texas Shop Towel, Inc. v. Haire*, 246 S.W.2d 482 (Tx. Civ. App. 1952). W.S. Haire operated a business renting and delivering shop towels. On April 1, 1950, he sold the business to Texas Shop Towel. At the time of the sale, Haire had two deliverymen including Frank Bell. In exchange for $12,000, Haire agreed "that he, his agents, servants and employees" would not run a shop towel rental business in nineteen counties for a period of five years. On July 1, 1950, Bell opened a competing business.

Texas Towel initiated a lawsuit against Haire. Bell was not made a party to the action. Following a defense verdict, the appellate court affirmed, noting:

> It is one thing for an employee voluntarily to surrender his known rights; it is vastly different when an employee is placed under servitude by a contract to which he is not a party and about which he may know nothing. . . . [I]n a contract restricting trade, we do not think that an employee's individual right and freedom to contract may be traded away by a third person, even by the third party's express contract.

*Id.* at 484.

However, other courts have determined that similar no-hire agreements, although they are in restraint of trade, are permitted.

In *Therapy Services, Inc. v. Crystal City Nursing Center, Inc.*, 389 S.E.2d 710 (Va. 1990), a case with certain factual similarities to *Heyde*, the Supreme Court of Virginia reached a different conclusion.

Therapy Services employed certified physical, occupational and speech therapists that it provided to health care facilities. In October of 1984 and December of 1985, Therapy Services entered into contracts with Crystal City Nursing Center to provide rehabilitation services to its patients. In November 1987, while ten Therapy Services employees were working for Crystal City, it informed Therapy Services that it was terminating the agreements in accordance with the contracts. Shortly thereafter, Crystal

City attempted to hire the Therapy Services employees. Therapy Services sought an injunction asserting that "Crystal City breached paragraph 13 of the agreements, under which Crystal City agreed not to hire any of the staff which Therapy Services provided under the contract for the duration of the contract period and for six months following the termination thereof." *Id.* at 711.

At a hearing, the Therapy Services employees testified they were unaware of paragraph 13 before accepting employment with Therapy Services. Based on this testimony, the trial court determined the employees had unknowingly waived their right to seek a livelihood, and accordingly the agreements included in paragraph 13 were against public policy. Therefore, the court granted Crystal City's motion for summary judgment.

The Supreme Court of Virginia reversed. Recognizing this was a case where one party "agree[d] to forego the ability to hire certain people who are not parties to the contract[,]" "the contract [was] in restraint of trade and will be held void as against public policy if it is unreasonable as between the parties or is injurious to the public." *Id.* at 711.

The court agreed with Therapy Services that it had "a legitimate interest in protecting its ability to maintain professional personnel in its employ," *id.* at 711-12, "and that paragraph 13 affords fair protection to that interest." *Id.* at 712. The court then considered "whether the provision is so large as to interfere with the interest of the public." *Id.* (quotation and citation omitted). Therapy Services argued the provision only restricted the employees from working for Crystal City for six months after termination of the contract, and did not prohibit the employees from seeking work anywhere other than Crystal City. Furthermore, it asserted "the employees' lack of knowledge of the restriction is immaterial, pointing out that other restrictive agreements such as restrictive employment agreements and exclusive dealing arrangements impact on the interests of entities which are not parties to such agreements." *Id.*

The Virginia Supreme Court held that "[a]lthough the provision in question involves an employee's ability to secure future employment, it is neither a covenant not to compete nor a restrictive covenant between employer and employee. It is a contract between two businesses." *Id.* at 711. Accordingly, it reasoned that the contract would be void against public policy only "if it is unreasonable as between the parties or is injurious to the public." *Id.* The court concluded while "[t]he right to earn a livelihood is embraced in the constitutional concept of 'liberty[,]'" it "is conceptually and practically distinct from a claim of a right to specific employment." *Id.* Because the evidence indicated that therapists were in low supply and high demand in Northern Virginia, the court concluded they could find similar positions if they chose to leave Therapy Services' employ. Furthermore, the public interest would not be adversely impacted because the therapists could continue to work in Northern Virginia. Since the agreement protected the employer's interest and did not harm the employees' livelihoods nor the public, the court deemed valid the no-hire provision. *Id.* at 712.

The Illinois Supreme Court also weighed in on the issue in *H & M*, *supra*. H & M was in the business of providing truck drivers and related personnel to its customers. On January 10, 2000, H & M and Fox Valley entered into an agreement, paragraph 13 of which stated that for a period of one year from the termination of the contract, Fox Valley would not hire any of the drivers furnished by H & M. However, Fox Valley could hire any driver whose employment with H & M terminated at least one year prior to being hired by Fox Valley. Paragraph 13 also provided that if Fox Valley hired any driver in violation of the agreement, it would pay $15,000 per driver to H & M as liquidated damages plus costs and expenses including attorneys' fees. The length of the contract was indefinite until canceled by either party.

While the contract was in force, H & M provided driver James Booker to Fox Valley, and on February 11, 2000, Fox Valley hired Booker. H & M filed a complaint for breach of contract seeking damages as provided in paragraph 13. The circuit court rejected H & M's contention that paragraph 13 violated "public policy as it is a restraint of trade on a third party." *Id.* at 1179. The court entered judgment on the pleadings in favor of H & M in the amount of $18,747.00. The appellate court affirmed

The Supreme Court of Illinois noted that "in keeping with the principle of freedom of contract, [the court] has been reluctant to invoke its power to declare a private contract void as contrary to public policy." *Id.* at 1180. Furthermore, "[w]hether an agreement is contrary to public policy depends on the particular facts and circumstances of the case." *Id.* (citation omitted). Noting the public policy issue had "not been squarely addressed by the Illinois courts," *id.* at 1182, the court examined *Heyde* and *Therapy Services.* The court noted:

> This is not a case where the employee is arguing that he or she has been foreclosed from employment. In our view, the provision at issue restricted one employer's ability to hire former employees of the other employer. Thus, as the Virginia Supreme Court recognized [in *Therapy Services*], the contract provision acts as a restraint on trade. This court has held that "in determining whether a restraint [on trade] is reasonable it is necessary to consider whether enforcement will be injurious to the public or cause undue hardship to the promisor and whether the restraint imposed is greater than is necessary to protect the promisee." *Bauer v. Sawyer*, 8 Ill.2d 351, 355, 134 N.E.2d 329 (1956).

*Id.* at 1183-84.

The court agreed with H & M that it had a legitimate interest in "protect[ing] its sole business asset, its drivers, from being hired away by its customers," *id.* at 1184, and that "paragraph 13 affords fair protection to that interest." *Id.* It further observed that H & M employees are not restricted from seeking employment as drivers with any employer

other than Fox Valley, Fox Valley is only restricted from hiring H & M employees who had been provided to it by H & M, and that if Fox Valley wished to hire such employees, it could do so by paying liquidated damages to H & M. *Id.* In light of these facts and the lack of evidence in the record disclosing any adverse impact on the interests of the public, the court held, "paragraph 13 was not void as against public policy." *Id.*

In *GeoDecisions*, *supra*, the United States District Court for the Middle District of Pennsylvania also considered a no-hire provision. GeoDecisions and Data Transfer Solutions (DTS) were direct competitors in the information technology field. They agreed to team up on a project in California, and on May 28, 2010, entered into a mutual nondisclosure agreement. Paragraph 16 of the agreement provided, in full: "For a period of two (2) years from the date of this Agreement, neither party shall solicit for employment or employ any person employed by the other party, or otherwise encourage any person to terminate employment with such party." In October 2010, DTS extended offers of employment to twelve GeoDecisions employees, most of whom resigned their positions at GeoDecisions. GeoDecisions filed an action alleging breach of contract and seeking injunctive relief. On October 22, 2010, the court entered a temporary restraining order prohibiting DTS from hiring anyone employed by GeoDecisions since May 28, 2010. On December 3, 2010, the court entered a preliminary injunction to the same effect pending further order of court.

In reaching its decision, the court noted the lack of "any Pennsylvania cases squarely addressing a similar no-hire provision in an agreement between two corporations." *GeoDecisions*, 2010 WL 5014514 at *3. The court recognized that "agreements containing such provisions are construed as contracts in restraint of trade," *id.* (citing *H & M*, 805 N.E.2d at 1184). As a restraint of trade, the court stated that the no-hire provision was void under Pennsylvania law unless "(1) it is ancillary to the main

purpose of a lawful transaction; (2) it is necessary to protect a party's legitimate interest; (3) it is supported by adequate consideration; and (4) it is reasonably limited in both time and territory." *Id.* at *4 (citing *Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Prop. & Cas. Ins. Agency*, 693 A.2d 1330, 1337 (Pa. Super. 1997)).

Analyzing whether the no-hire provision was ancillary, the court noted that "'contracts in restraint of trade made independently of a sale of a business or contract of employment are void as against public policy regardless of the valuableness of the consideration exchanged. *Jacobson* [*& Co., Inc. v. Int'l Env't Corp.*] 235 A.2d [612,] 617 [(Pa. 1967)].'" *GeoDecisions*, 2010 WL 5014514, at *4. Nevertheless, "[w]hile the rule appears to strictly limit the types of agreements to which restraints of trade may be ancillary, in practice courts have construed this restriction somewhat liberally." *Id.* For example, this Court "has upheld restraints of trade ancillary to sales of substantial equity interest or franchise rights." *Id.* (citing *Piercing Pagoda, Inc. v. Hoffner*, 351 A.2d 207 (Pa. 1976); *Ala. Binder and Chem. Corp. v. Pa. Indus. Chem. Corp.*, 189 A.2d 180 (Pa. 1963)). *GeoDecisions* noted that in *Jacobson*, we relied on *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 282 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1889), which held that a covenant in restraint of trade is permissible where it is merely ancillary to the main purpose of agreement, and "is inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits, he may suffer from the unrestrained competition of the other."

The court concluded that the instant no-hire provision satisfied the ancillary rule, because, like the one in *Therapy Services*, it did not solely "restrict a corporation's ability to hire a competitor's employees. Rather, the purpose of the arrangement was to ensure a productive temporary cooperative relationship." *GeoDecisions*, 2010 WL 5014514 at *5. The court further found that "both DTS and GeoDecisions had a legitimate business

interest in including the no-hire provision in the Agreement" as it protected the parties' confidential information and prevented the poaching of employees who had specialized knowledge. *Id.* Additionally, the court found the agreement was supported by adequate consideration and was reasonably limited in geographic scope and duration. *Id.* at \*6.

With respect to the non-parties who were affected by the no-hire provision, the court noted:

> [T]here is no evidence of record to suggest that these employees were aware that DTS was in breach of contract by extending employment offers to them. Indeed they unwittingly placed themselves at the center of this dispute because neither party disclosed to them even the existence of the Agreement now at issue. However, . . . parties cannot avoid their contractual obligations by asserting a claim of hardship on behalf of a non-party.

*Id.* at \*10. The court therefore concluded that no-hire provision was not unreasonable. *Id.* at \*7.

III.

Against this background, we turn to the arguments of the parties, beginning with PLS, which relies on *Krauss v. M.L. Caster & Sons, Inc.*, 254 A.2d 1 (Pa. 1969), for the proposition that "arm's-length contracts between sophisticated entities are presumptively enforceable and will not be readily ignored by the courts." Appellant's Brief at 24. Here, the record reflects that PLS and Beemac are sophisticated parties who negotiated a mutually beneficial arm's-length agreement resulting in revenue of $561,538.13 for Beemac in the last year of the contract. *Id.* at 25. PLS asserts that it "has a legitimate business interest in protecting its employee assets [from] poaching by its business partners." *Id.* Accordingly, PLS maintains that by voiding the no-hire provision, "the Superior Court disregarded Pennsylvania public policy which counseled it to enforce the terms of the agreement that these parties who were on a level playing field negotiated in good faith and entered at arm's length." *Id.*

PLS explains the purpose of Section 14.6 of the Contract as follows:

> A no-hire provision is aimed at a specific carrier in PLS's logistics chain; its intent is to disincentivize the carrier from poaching that which PLS values and needs most - its employees, who by virtue of PLS's involvement in training them, develop the specialized knowledge and expertise that makes them so attractive to one who might be inclined to transact business directly with a shipper. The tool that safeguards PLS's vital and legitimate interest in protecting it from those in the logistics chain who would steal its business model by poaching its employees is a no-hire provision.

*Id.* at 32-33.

PLS recognizes that courts may declare a term in a contract unenforceable as a violation of public policy. As this Court has stated:

> Generally, a clear and unambiguous contract provision must be given its plain meaning unless to do so would be contrary to a clearly expressed public policy. When examining whether a contract violates public policy, this Court is mindful that public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract.
>
> . . .
>
> It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract is against public policy].

*Eichelman v Nationwide Ins. Co.*, 711 A.2d 1006, 1008 (Pa. 1998) (citations omitted).

PLS argues that the Superior Court "did not have the authority to impose its view of preferred business practices by declaring no-hire provisions, including Section 14.6, unenforceable as a matter of law in the absence of an established public policy rationale." Appellant's Brief at 27.

PLS views Section 14.6 as a promise made by Beemac to PLS, for valuable consideration, "to forego hiring certain persons who were not parties to the Contract." *Id.*

at 28. It argues that the Superior Court erred by focusing on the interests of these non-parties who are only precluded from working for Beemac and are not barred from employment with any other entity in the trucking/logistics field.

Covenants not to compete between employers and employees, which have the effect of limiting employment opportunities for employees, are enforceable provided they meet certain requirements. *See Rullex Co., LLC v. Tel-Stream, Inc.*, --- A.3d ---, 2020 WL 3244343 (Pa. 2020); *Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838 (Pa. 1957). Accordingly, PLS maintains the "Superior Court's conclusion that all no-hire clauses are *per se* violations of public policy because of their limiting effect on the further employment opportunities of the contracting party's employees is incongruent with established Pennsylvania law." Appellant's Brief at 33.

PLS further argues that the weight of authority from other courts supports the enforcement of reasonable no-hire provisions that are incidental to commercial agreements between business entities. Significantly, in *GeoDecisions*, the court concluded that a no-hire provision comparable to Section 14.6 served the legitimate business interests of protecting confidential information and "preventing the poaching of staff who possess DTS's and GeoDecisions's 'know-how.'" *GeoDecisions*, 2010 WL 5014514 at *5. Furthermore, the court determined the agreement was supported by adequate consideration and the scope and duration of the no-hire provision were reasonable. *Id.* at 6-7.

PLS also cites to the decision of the Illinois Supreme Court in *H & M*, where the court held the no-hire provision was necessary for the employer, "as it protects its sole business asset, its drivers, from being hired away by its customers. If customers could hire H & M's drivers on a permanent basis, then they would no longer need H & M's services." *H & M*, 805 N.E.2d at 1184.

In addition, PLS relies on *Therapy Services*, where the Virginia Supreme Court held that in the absence of a no-hire provision, the plaintiff "would become an involuntary and unpaid employment agency" for its customers. *Therapy Servs.*, 389 S.E.2d at 712.

Along with criticizing the Superior Court for not following *GeoDecisions*, *H & M*, *and Therapy Services,* PLS takes issue with the cases from other jurisdictions that the Superior Court relied upon when declaring the no-hire provision unenforceable. It notes that *Heyde*, "involved the interplay of the no-hire clauses and Wisconsin's statutory regimen governing employee non-competition agreements. In Wisconsin, non-competition agreements are governed by statute and are strictly construed." Appellant's Brief at 38. Moreover, while the employer did not require its employees to sign a non-competition agreement, one employee testified she, "specifically asked [employer] whether she would be bound by a non-compete agreement and was told that she would not be bound by such restrictions." *Heyde*, 654 N.W.2d at 836. Arguing that the employer in *Heyde* actively deceived an employee, and that non-compete agreements in Wisconsin are regulated by statute while they are prima facie enforceable in Pennsylvania, PLS maintains that the Superior Court's reliance on *Heyde* was misplaced.

PLS further asserts that the Superior Court erred in relying on *VL Systems*, arguing that the decision was not a per se rejection of no-hire provisions but rather was fact-specific. Appellant's Brief at 40. In *VL Systems,* the California Court of Appeal held that where an employee was hired by a consulting firm after the firm had completed its contract with a customer, the employee was not subject to the 12-month no-hire restriction in the consulting firm/customer contract. The court recognized, "[t]his is not a case where the happy client of a consulting firm attempts to poach an employee." *VL Systems*, 152 Cal. App. 4th at 715. In contrast, PLS notes that the employees hired by Beemac "were

specifically targeted because of their experience and expertise at PLS, and they now specifically perform those same services for Beemac." Appellant's Brief at 40.

PLS argues that the cases relied upon by the Superior Court in support of its conclusions are distinguishable, and that "cases enforcing no-hire provisions are not only based on sound jurisprudential grounds, but are properly appreciative of the economic context and business realities that lead intermediary companies, like PLS, to find them necessary to further their business interests." *Id*. at 41.

In contrast, Beemac suggests that the Superior Court correctly applied Pennsylvania law regarding restraints of trade in holding that the no-hire provision violates public policy. It argues that PLS, "fails to explain why a company, already in a superior bargaining position when hiring and negotiating with employees, should be free to contract away the rights of its employees by way of contracts to which they are not parties and for which they receive no consideration." Appellee's Brief at 21.

As recognized by this Court, this Commonwealth has a "long history of disfavoring restrictive covenants." *Socko v. Mid-Atlantic Sys. of CPA, Inc.*, 126 A.3d 1266, 1268 (Pa. 2015). "While generally disfavored, Pennsylvania law, however, has recognized the validity and enforceability of covenants not to compete in an employment agreement, assuming adherence to certain requirements." *Id*.

> Consistent with this legal background, currently in Pennsylvania, restrictive covenants are enforceable only if they are: (1) ancillary to an employment relationship between an employee and an employer; (2) supported by adequate consideration; (3) the restrictions are reasonably limited in duration and geographic extent; and (4) the restrictions are designed to protect the legitimate interests of the employer.

*Id*. (citations omitted).

The only other situation in which this Court has approved a provision in restraint of trade is where it is part of a contract for the sale of a business. *Id*. (citing *Morgan's*, 136

A.2d at 845). Because the no-hire provision of Section 14.6 is not ancillary to an employment relationship or the sale of a business, Beemac asserts it is presumptively void. Appellee's Brief, at 24.

Turning to the question of public policy, this Court has held that "avoidance of contract terms on public policy grounds requires a showing of overriding public policy from legal precedents, governmental practice, or obvious ethical or moral standards." *Tayar v. Camelback Ski Corp.*, 47 A.3d 1190, 1199 (Pa. 2012) (citation omitted). Beemac notes that because the instant matter presents an issue of first impression regarding no-hire contracts, reliance on Pennsylvania precedent is not possible. However, it avers that "governmental practice, ethical and moral standards, and persuasive decision[s] of other jurisdictions all weigh against the enforcement of no-hire restrictions." Appellee's Brief at 28.

With respect to governmental practice, Beemac states that recently the Department of Justice (DOJ) has taken a strong stand against no-hire restrictions. It notes that the U.S. District Court for the Western District of Pennsylvania relied on a statement of interest filed by the DOJ in determining that the plaintiffs had sufficiently alleged that the no-poach agreements were a per se violation of antitrust laws. *See In re Ry. Indus. Employee No-Poach Antitrust Litig.*, 395 F.Supp.3d 464, 485 (W.D. Pa. 2019) (The court's decision . . . is supported by the government's explanation . . . that the federal agencies charged with enforcing the antitrust laws consider naked no-poach agreements per se violations of the Sherman Act[4] and the DOJ will proceed criminally against those who enter into those kinds of agreements.").

---

4 Section 1 of The Sherman Act provides, in relevant part, "Every contract . . . in restraint of trade or commerce among the several States, or with foreign nations, is declared illegal." 15 U.S.C. § 1.

Beemac further notes that the DOJ submitted a similar statement of interest in *Seaman v. Duke University*, No. 1:15-CV-462, 2019 WL 4674758 (M.D.N.C. Sept. 25, 2019), where it was alleged that "Duke had entered into an unlawful agreement with the University of North Carolina to prevent lateral hiring of certain medical employees." *Id.* at *1. The case ended in a settlement that "requires Duke to pay $54,500,000 and will also result in significant injunctive relief." *Id.*

*Amicus curiae* Josh Shapiro, Attorney General of the Commonwealth, has filed a brief which, *inter alia*, supports Beemac's assertion that along with the DOJ, several state attorneys general have actively focused on no-hire restrictions. In 2019, the Attorneys General of Pennsylvania and Massachusetts led a 14-state settlement with four national franchisors "to cease using 'no-poach' agreements that restrict the rights of fast food workers to move from one franchisor to another within the same restaurant chain."[5] *Amicus* Brief, at 13-14. In 2020, the Attorneys General reached a settlement with three additional national franchisors.[6]

Beemac further argues that governmental rejection of no-hire restraints "is firmly rooted in long-established ethical and moral standards." *Id.* at 32. Almost a century ago, the United States Supreme Court stated, "freedom in the making of contracts of personal employment . . . is an elementary part of the rights of personal liberty[.]" *Prudential Ins.*

---

[5] Press Release, *AG Shapiro Secures Win for Workers as Four Fast Food Chains Agree to End Use of No-Poach Agreements* (March 12, 2019), https://www.attorneygeneral.gov/taking-action/press-releases/ag-shapiro-secures-win-for-workers-as-four-fast-food-chains-agree-to-end-use-of-no-poach-agreements/ (last accessed August 6, 2020).

[6] Press Release, *Three Fast Food Chains Agree to End Use of No-Poach Agreements* (March 2, 2020), https://www.mass.gov/news/three-fast-food-chains-agree-to-end-use-of-no-poach-agreements (last accessed August 6, 2020).

*Co. of Am. v. Cheek*, 259 U.S. 530, 563 (1922). This Court has held, "our Commonwealth has a long, and virtually uniform, history of strongly disfavoring covenants in restraint of trade." *Socko*, 126 A.3d at 1277. While there are limited circumstances where an employment agreement containing a restrictive covenant may be enforced, "consideration is crucial." *Id.* at 1274. This is so because employees must receive a meaningful benefit in exchange for a restriction on their rights to seek employment in their chosen fields. "No-hire restrictions, however, impose a restraint, without a corresponding benefit, which is adverse to the ethical and moral standards underpinning the limited circumstances in which restraints of trade may be enforced." Appellee's Brief at 33.

Beemac also asserts that the Superior Court properly relied on decisions from other jurisdictions when refusing to enforce Section 14.6. It notes that in *Heyde*, the Wisconsin Supreme Court struck down the provision precluding a nursing home from hiring or soliciting any Greenbriar employee during the term of employment and for one year after. The court noted the no-hire provision was oppressive to the employees because they had no knowledge of it, and received no consideration for the restraint on their right to make choices about their own employment. *Heyde*, 654 N.W.2d at 836.

Beemac argues that PLS's attempt to distinguish *Heyde* because it relied on a Wisconsin statute prohibiting restrictive covenants in employment agreements unless they are reasonably necessary for the protection of the employer is unavailing. While no Pennsylvania statute applies to contractual restraints, case law makes clear that restrictive covenants are permitted only if they meet specific requirements including protection of "the legitimate interests of the employer." *Socko*, 126 A.3d at 1274.

Beemac also takes PLS to task for asserting that *Heyde* is distinguishable because one of the employees hired by Dove testified that when she asked Greenbriar whether she would be bound by a non-compete agreement, she was told she would not be subject

to such restriction. The holding of *Heyde* is not based on the alleged deception of the employer. Rather, it was but one of several factors that led the court to conclude that the no-hire provision was unenforceable.

Along with endorsing the Superior Court's reliance on *Haire* and *VLS Systems*, Beemac criticizes the decisions from other jurisdictions cited by PLS upholding no-hire provisions. It notes that in *H & M*, *Therapy Services*, and *GeoDecisions*, "the courts rejected the fundamental notion that no-hire restrictions directly and substantially impact non-party employees and, instead, viewed the restrictions as having no material impact on employees." Appellee's Brief at 40. It further asserts these decisions fail to give due weight to the absence of consideration.

In particular, it asserts that the *GeoDecisions* court erroneously concluded that Pennsylvania courts have liberally construed the ancillary rule to enforce restraints of trade outside the employment and buy-sell contexts. *GeoDecisions*, 2010 WL 5014514. Beemac notes that *GeoDecisions*' reliance on *Piercing Pagoda* for this proposition is misplaced because in that case we held a covenant not to compete in a franchise agreement is analogous to one in an employment contract. *Piercing Pagoda*, 351 A.2d at 212. Furthermore, in *Ala. Binder*, this Court examined a restrictive covenant in an employment agreement made in conjunction with a buy-sell agreement. *Ala. Binder*, 189 A.2d at 184. Accordingly, Beemac argues that Pennsylvania case law does not support the district court's conclusion in *GeoDecisions* that we liberally construe the ancillary rule beyond the employment or buy-sell contracts. Appellee's Brief at 45.

IV.

Our review of a trial court's order granting or denying preliminary injunctive relief is "highly deferential." *Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000 (Pa. 2003). Accordingly, we "examine the record to determine if there

were any apparently reasonable grounds for the action of the court below." *Id.* In denying the injunction, the trial court relied on its conclusion that PLS did not establish a substantial likelihood of success on the merits. "We will find that a trial court had apparently reasonable grounds for its denial of injunctive relief where the trial court has properly found that any one of the . . . essential prerequisites for a preliminary injunction is not satisfied." *Warehime v. Warehime*, 860 A.2d 41, 46 (Pa. 2004) (citation and quotations omitted).[7]

"In assessing whether the common pleas court acted properly, we review its factual findings deferentially while resolving issues of law *de novo*. In this latter regard, we will interfere with the court's decision only where the rule of law relied upon was palpably erroneous or misapplied." *Rullex*, 2020 WL 3244343 at *4 (citations and quotations omitted).

Pennsylvania common law has treated restrictive covenants as restraints on trade that are void as against public policy unless they are ancillary to an otherwise valid contract. *Socko*, 126 A.3d at 1277 ("[O]ur Commonwealth has a long, and virtually uniform, history of strongly disfavoring covenants in restraint of trade."); *Morgan's*, 136 A.2d at 843 ("It has long been the rule at common law, that contracts in restraint of trade made independently of a sale of business or contract of employment are void as against public policy regardless of the valuableness of the consideration exchanged therein."). To determine the enforceability of a provision in restraint of trade that is ancillary, or

---

[7] The six essential prerequisites are: (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; (2) greater injury would result from refusing an injunction than from granting it; (3) the injunction will restore the parties to their status as it was immediately before the alleged wrongful conduct; (4) the activity sought to be restrained is actionable, the right to relief is manifest, and the moving party must show it is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and (6) a preliminary injunction will not harm the public interest. *Warehime*, 860 A.2d at 46-47.

supplementary, to the principal purpose of a contract, we employ a balancing test to determine the reasonableness of the restraint in light of the parties' interests that the restraint aims to protect and the harm to other contractual parties and the public. *See Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 917-18 (discussing the development of the balancing test); *see also GeoDecisions*, 2010 WL 5014514 at *4. As part of this balancing test, courts also consider the reasonableness of the restraint's geographical scope as well as its duration of time. *See Socko*, 126 A.3d at 1274. Similarly, the Restatement (Second) of Contracts delineates the following test, identified as "the rule of reason," for evaluating the reasonableness of ancillary restraints on competition:

> (1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably in restraint of trade if
>
> > (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or
> >
> > (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.

RESTATEMENT (SECOND) OF CONTRACTS § 188(1). Further, this Court has explained that the reasonableness test is more stringent when examining restrictive covenants ancillary to an employment agreement than when evaluating restrictive covenants ancillary to the sale of a business. *Hayes v. Altman*, 266 A.2d 269, 271 (Pa. 1970).

While the enforceability of a no-hire provision ancillary to a services contract between two businesses is an issue of first impression for this Court, we will apply the foregoing reasonableness test that applies to ancillary restraints on trade.[8] Here, the no-

---

[8] This is consistent with the United States Department of Justice's (DOJ) approach to enforcing federal antitrust law. In 2016, the DOJ and Federal Trade Commission (FTC) issued guidance for human resources professionals explaining that non-ancillary no-poaching agreements between employers—short-handed as "naked" no-poach agreements—are per se illegal. DOJ/FTC Antitrust Guidance for HR Professionals (Oct.

hire provision was ancillary to the principal purpose of the shipping contract between PLS and Beemac. The no-hire provision is a restraint on trade because the two commercial entities agreed to limit competition in the labor market by promising to restrict the employment mobility of PLS employees. *See* RESTATEMENT (SECOND) OF CONTRACTS § 186(2) ("A promise is in restraint of trade if its performance would limit competition in any business"). PLS had a legitimate interest in preventing its business partners from poaching its employees, who had developed specialized knowledge and expertise in the logistics industry during their training at PLS. *See* PLS's Brief at 25, 32; *Morgan's*, 136 A.2d at 846 (recognizing an employer has an interest in preventing its employees from using their specialized knowledge and skills in competition with the employer).

However, the no-hire provision is both greater than needed to protect PLS's interest and creates a probability of harm to the public. It is overbroad because it precludes Beemac, and any of its agents or independent contractors, from hiring, soliciting, or inducing any PLS employee or affiliate for the one-year term of the contract plus two years after the contract ends. The no-hire provision precluded Beemac from hiring or soliciting all PLS employees, regardless of whether the PLS employees had worked with Beemac during the term of the contract. As the Superior Court noted, "[b]y the plain reading of the language of this restrictive provision, it was meant to have effect in the broadest possible terms." *Pittsburgh Logistics Sys.*, 202 A.3d at 808.

Further, the no-hire provision creates a likelihood of harm to the public, *i.e.*, non-parties to the contract. The no-hire provision impairs the employment opportunities and job mobility of PLS employees, who are not parties to the contract, without their

2016), at 3, https://www.justice.gov/atr/file/903511/download. In contrast, the DOJ advised that legitimate joint ventures are not per se illegal and has advocated for the rule of reason to apply to ancillary restraints on trade. *Id.*; *see also* DOJ Antitrust Division Update, No-Poach Approach, 9/30/19, https://www.justice.gov/atr/division-operations/division-update-spring-2019/no-poach-approach (discussing the statement of interest the DOJ filed in cases involving no-poach agreements in fast food franchises).

knowledge or consent and without providing consideration in exchange for this impairment. Further, the injury to PLS employees is not hypothetical. In this case, PLS enforced the no-hire provision by seeking to enjoin Beemac from employing the former PLS employees who had already left PLS and obtained employment with Beemac. If PLS was successful, the effect of its enforcement of the no-hire provision would have deprived its former employees of their current jobs and livelihoods.[9] Moreover, the no-hire provision undermines free competition in the labor market in the shipping and logistics industry, which creates a likelihood of harm to the general public. *See, e.g.*, Donald J. Polden, *Restraints on Workers' Wages and Mobility: No-Poach Agreements and the Antitrust Laws*, 59 SANTA CLARA L. REV. 579, 610 ("[T]he high percentage of U.S. workers who are subject to agreements and covenants restricting their employment opportunities are contributing to slow wage growth and rising inequality. For example, recent studies have demonstrated that worker wages are 4%-5% higher in states that do not recognize or enforce worker non-compete restraints.") (footnotes omitted). Balancing PLS's interest against the overbreadth of the no-hire provision and the likelihood of harm to the public, we conclude that the no-hire provision is unreasonably in restraint of trade and therefore unenforceable.

Accordingly, the order of the Superior Court is affirmed.

Chief Justice Baer and Justices Saylor, Todd, Donohue, Dougherty and Wecht join the opinion.

---

[9] On December 1, 2016, the trial court granted injunctive relief precluding Beemac from employing the former PLS employees. The injunction remained in effect for three weeks, until the trial court vacated it on December 22, 2016.